JOHN J. RASKOB, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 69673.   Promulgated June 30, 1938.

*Joseph M. Hartfield, Esq., Walter S. Orr, Esq., A. Chauncey New-lin, Esq.,* and *Winslow M. Lovejoy, Esq.,* for the petitioner.

*Mason B. Leming, Esq., James D. Head, Jr., Esq., J. Arthur Adams, Esq., L. J. Schwartz, Esq., H. L. Brown, Esq.,* and *Hugh R. Dowling, Esq.,* for the respondent.

DISNEY: The original petition and original answer put in issue only questions involved in a deficiency of Federal income tax for the year 1929 in the sum of $15,977.61. Thereafter, respondent filed amended answer, claiming increased deficiency of $1,026,340.40; thereafter, petitioner filed amended petition asserting errors additional to those asserted in the original petition. The proceeding came on for hearing on May 26, 1937. The filing of briefs was completed on January 27, 1938. Some issues have been abandoned and others disposed of by stipulation, and decision thereon will be entered under Rule 50, so that only the controverted issues need be discussed herein. These consist of (1) an issue as to the deduction of losses from sales of stock; (2) an issue as to losses claimed in Copper Stocks Trading Account; and (3) an issue as to income from the Simms Petroleum Co. Syndicate. Each issue when stated will be followed by findings of fact and opinion thereon.

*Issue as to Deduction of Losses on Sales of Stock.*

This issue involves losses on sales of stock made by the petitioner to Pierre S. du Pont, petitioner in Docket No. 69674, as a part of cross sales to each other in the year 1929. Petitioner in his income tax return for 1929 claimed with respect to this issue a deduction of $4,375,523.51 for alleged losses on the sale of certain stocks. This claim was not disallowed in the determination of deficiency by the respondent, but respondent allowed a further deduction in the amount of $80,434.03 on account of certain adjustments. Both of these amounts the respondent by his answer to amended petition alleges to have been erroneously allowed as deductions and asks that the deficiency be increased accordingly.

### FINDINGS OF FACT.

This issue is common to this proceeding and to the proceeding in Docket No. 69674, Pierre S. du Pont, and, the evidence being the same in both proceedings on this issue, by virtue of consolidation of the two proceedings as to this issue by agreement of counsel at hearing, the findings of fact set forth in proceeding No. 69674 are made the findings of fact herein by reference.

### OPINION.

The question on this issue being common with the same issue in Pierre S. du Pont, 37 B. T. A. 1198, in which opinion has this day been rendered, for the reasons therein set forth we hold that the respondent erred in allowing the deductions claimed by petitioner for said alleged stock losses as adjusted, in the amount of $4,455,957.54.

---

*Issue as to Loss Claimed in Copper Stocks Trading Account.*

The issue here is as to computation of losses claimed by reason of participation in and termination of Copper Stocks Trading Account, involving the question as to the nature of such trading account or syndicate.

### FINDINGS OF FACT.

The facts on this issue are stipulated, except entries made by a broker in an account to reflect Raskob's participation in the trading account, which are embodied in Exhibit E–5. There is no dispute as to the amounts shown in such exhibit. The stipulation and exhibit are therefore adopted by reference as our findings of fact on

this issue, and the facts will be set forth herein only so far as necessary for consideration of the issue.

### OPINION.

On or about March 27, 1929, petitioner invested $2,000,000 in Copper Stocks Trading Account, which he had entered on or about March 19, 1929. On May 23, 1929, he received, after termination of the trading account on May 21, 1929, 7,066 shares of stock in the Anaconda Copper Mining Co. and on May 24, 1929, received $801,290.89 in cash. The stock had a fair market value when received of $731,331. The losses from sales by the trading account of copper stocks, interest paid, interest received, and taxable dividends received on the Anaconda Copper Mining Co. stocks, attributable to petitioner's proportionate interest in the trading account, were as follows:

| | |
|---|---|
| Losses from sales | $373,730.14 |
| Interest paid | 15,778.89 |
| Interest received | 12,988.65 |
| Taxable dividends | 13,238.35 |

The petitioner did not report in his Federal income tax return for 1929 any of these items on account of the operations of the trading account. He did not claim any loss, and respondent in determining the deficiency did not allow any deduction on account of operations of the trading account.

Petitioner's contention is, in effect, first, that the trading account was a taxable entity and not a partnership or joint venture, and that therefore his tax position is determined upon liquidation thereof, in which he then suffered a deductible loss; and, in the alternative, that if the trading account was not a taxable entity, he suffered individual losses in its operations, plus certain losses by the liquidation of the account.

For convenience in consideration, the instrument creating the Copper Stocks Trading Account is set forth in the margin.[1]

---

[1] PRIVATE AND CONFIDENTIAL

W. E. HUTTON & COMPANY

52 Wall Street

New York

"Copper" Stocks Trading Account

MARCH 19, 1929.

Mr. J. J. RASKOB.
*DuPont Bldg., Wilmington, Delaware.*

DEAR SIR: We beg to confirm our understanding with you that we are forming "'Copper' Stocks Trading Account" to trade in any copper stocks listed on the New York Stock Exchange, and that you are to have a participation of 50,000 shares in the same out of a total not to exceed One Million (1,000,000) shares, upon the terms and conditions hereinafter set forth:

We are to be the Managers of the Trading Account and we and/or the firm of which we are members may also participate therein. All transactions for the Trading Account

Each case of this character must be decided upon its own facts. The test is pragmatic. *Morrissey* v. *Commissioner*, 296 U. S. 344. The account here under consideration carries features tending both to affirm and contradict the idea of legal entity as distinguished from that of partnership or joint venture on the part of the individuals. Among the characteristics determinative of this question, as set forth by the Supreme Court, are centralized management of business, assignability of interest, continuity of organization independent of the individual participation, and limited liability and association of parties in a business enterprise for gain. *Morrissey* v. *Commissioner*, supra; *Helvering* v. *Coleman-Gilbert Associates*, 296 U. S. 369. The Copper Stocks Trading Account was under the control of managers, who, for the account, had uncontrolled discretion to

shall be in accordance with and subject to the constitution, by-laws, rules, regulations, requirements and customs of the New York Stock Exchange, as well as of the governing committees, boards of governors, other governing bodies, committees and officials thereof. As Managers, we shall have full power in our uncontrolled discretion for this Account to buy, sell and generally trade in any of the aforesaid "copper" stocks, either for long or short account, and to deal in "puts" and "calls" thereon, at such times and prices as we shall deem for the best interests of the Account; provided, however, that the commitment of the Trading Account, either for long or short account, shall not at any one time exceed the aggregate of the Trading Account participations.

The Managers, for all purposes of this agreement, hereby appoint as their agents W. E. HUTTON & Co., upon whose books the said Trading Account is to be carried.

The Managers, and/or their agents, W. E. HUTTON & Co., from time to time and upon two days' notice, may call, and the participants thereupon agree to pay in cash, such amount or amounts as margin as the Managers may deem proper, but all calls for payment shall be made pro rata among the participants.

In case of the failure of any participant to make such payment as and when called, the Managers may sell the rights and interest of the defaulting participant in and under this agreement and the stock represented thereby at public or private sale at any time thereafter without advertisement or notice and, after deducting all interest or other costs and expenses, the residue shall be applied on any liability or indebtedness of such defaulting participant, and if there be any deficiency said participant shall pay and discharge same, any overplus shall be paid over to such defaulting participant. The Managers may purchase at any such sale the rights and interests of any defaulting participant for the benefit of the non-defaulting Trading Account and may call for and apportion any assessment to pay for the same; provided, however, that no such assessment shall be made if the result thereof would be to increase the amount subscribed to the Trading Account by the participants, respectively.

Any participant may, at his election and with the consent of the Managers, take up against payment for carrying purposes only his proportion of any share of stock then in the hands of the Managers for this Account. The Managers, and/or their said agents, may, at their election upon two days' notice, require any participant to take up against payment for carrying purposes only his proportion of any shares of stock then held by him for the Account.

The Managers shall have full discretionary power to borrow money for the Trading Account, either from themselves or others, and to pledge as security therefor any assets of the Trading Account, and also to pledge as security therefor this agreement and the several obligations of the participants hereunder.

Unless sooner terminated by the Managers in their discretion, the Trading Account will expire at the close of business on June 19, 1929. The Managers, however, without notice, may terminate the Account at any time, or may extend it for a further period of 90 days.

At the expiration of the Trading Account, each participant shall take up and pay for his respective proportion of any shares of stock then in the hands of the Managers for the Trading Account. Apportionment and distribution by the Managers of the profits, losses and expenses shall be conclusive upon the participants. Participants will share pro rata in the profits and losses of the Trading Account after allowing for all expenses.

buy, sell, and trade in copper stocks listed on the New York Stock Exchange, to borrow money for and pledge the assets of the account, to compel compliance with the obligation of a participant, and to sell his rights, interest and obligation for noncompliance (he to be liable for any deficiency to the extent of his pro rata, and to receive any excess of sales price over same). Some indication of individual control does appear in the provision that a participant could take up against payment his proportion of any stocks in the hands of the managers, but only with the consent of the managers, and only for carrying purposes. We hold that centralized management inhered in this organization. Provision was expressly made against partnership between participants or with the managers. This trading account was not a partnership; it was a business enterprise and not a mere trust. It had "the distinctive feature of being created to enable the participants to carry on a business and divide the gains which accrue from their common understanding." As to personal liability, there is no limitation to the amount contributed, though there is limitation as to each participant to the proportion his participation bears to the whole, the participants sharing in the profits and losses of the account on a pro rata basis, and, in case of a participant failing to pay his share of a loss, the amount being

Any loss resulting from the failure of any of the participants to carry out his or their obligation thereunder shall be charged as a loss to the Trading Account, but this shall not operate to relieve any participant from his liability hereunder.

Nothing herein contained shall constitute the participants partners with the Managers, or with one another, or render the Managers liable for the obligations of any of the participants. The default of any participant shall in no way relieve any other participant from his full obligation hereunder. The Managers shall not be liable under any of the provisions of this agreement, or for any matter in connection therewith, or for the exercise of his judgment and discretion in the management of the Trading Account, except for want of good faith.

Any notice from the Managers to any participant shall be deemed to have been duly given if mailed or telegraphed to such participant at the address furnished to the Manager by such participant.

The Managers are to receive ten (10%) per cent of the net profits of the Trading Account as and for their services to be rendered herein, said payment to be made prior to the distribution of the profits of said Trading Account among the participants.

Will you kindly confirm the acceptance of your participation in this Account by signing the form of acceptance upon the enclosed duplicate and returning it to us.

Very truly yours,

BRADFORD ELLSWORTH AND THOMAS E. BRAGG,
*Trading Account Managers.*

By [Signed] W. E. HUTTON CO.
*Agents.*

W. E. HUTTON & CO., *Agents,*
52 *Wall Street, New York City.*

The undersigned hereby accepts a participation of _____ shares in the above Trading Account upon the terms and conditions above set forth.

_____

Address to which all _____
notices shall be sent _____

chargeable to the account but the participant not being relieved of his liability. Assessments were limited to the amount subscribed by participant, but this appears to refer not to liability for debts, but to the amount of enforced participation under the contract. The commitment of the trading account, either for a long or short account, was limited to the aggregate amount of participation in the trading account, which was a maximum of 1,000,000 shares. The managers had power to make apportionment and distribution of profits, losses, and expenses, which was conclusive upon participants. We conclude that there was no limitation of liability similar to that in a corporation. Evidence is not definite as to whether title to assets was in the trading account or in the participants, though mention is made of assets of the account and purchases and sales were made for the account. As to assignability of interests, no mention is made other than by sale by the manager in case of participant's default; nor does any certificate of participation appear other than a letter of proposal of formation, accepted by participant by signing an attached form. Considering the personal nature of the services rendered by the manager under this contract, there seems no presumption of assignability, and we conclude the contract here was not assignable in any usual or convenient manner, as in case of certificates evidencing corporate stock. *Commissioner* v. *Gerstle,* 95 Fed. (2d) 587, and that it is doubtful whether it was assignable at all. The trading account continued only a short time, from about March 27, 1929, to about May 23, 1929. Of course the continuity of business characteristic of the business entity alleged to exist here does not refer merely to length of life of organization, yet that element has been considered. *N. B. Whitcomb Coca-Cola Syndicate*, 35 B. T. A. 1031; affd., 95 Fed. (2d) 596, and the very brief, and easily terminable, life of the trading account is obviously dissimilar to the ordinarily extensive existence granted by a corporate charter. Moreover, it does not appear, aside from power in managers to sell a participant's interest for default, that the organization continued regardless of continuance of participation of a member. Indeed, considering the highly personal and financially important duties of the manager, the lack of any provision for selection of his successor seems to negative any idea of continuity of existence of the syndicate regardless of vacancy in that office. Considering all the elements of this trading account in the light of the guidance furnished by decided cases, we conclude that men were not in this syndicate associated together in a manner sufficiently similar to the status of stockholders as to constitute an association taxable as a corporation within the purview of the statute. We hold that the Copper Stocks Trading Account was a joint venture. *Swanson* v. *Commissioner*, 296 U. S. 362; *Helvering* v. *Combs*, 296

U. S. 365; *Helvering* v. *Coleman-Gilbert Associates, supra; Morrissey* v. *Commissioner, supra; Commissioner* v. *Gerstle, supra.*

In his amended petition, petitioner claimed a loss deduction of $376,520.38, a figure reached by adding to syndicate losses of $373,-730.14 on stock sales, the amount of $15,778.89 for interest paid by the syndicate, less interest of $12,988.65 received by the syndicate. Upon brief, he claims a deductible loss of $467,378.11 under two contentions, one in the alternative. By his first method the result is reached by deducting from his investment of $2,000,000, the cash and fair market value of the stock received on liquidation of the venture. In the alternative, he claims a net loss of $363,282.03 in the operations of the venture and a loss of $104,096.11 on liquidation, the latter figure being arrived at by deducting from an adjusted cost of $1,636,717.97 ($2,000,000 invested, less $363,282.03 losses) for his interest in the venture, the cash and fair market value of the stock received upon the termination of the venture, a total of $1,532,621 89. The main contention seems to be made on the theory that the trading account was an association taxable as a corporation, and the alternative on the ground that it was an entity of a different character.

Our conclusion that the trading account was a joint venture disposes of petitioner's main point. Petitioner and the other participants were co-owners of the property acquired by them during the existence of the joint venture and any income or loss sustained constituted income and loss of all as individuals, prorated among them. We cannot approve the additional claim under the alternative contention. Petitioner and other participants having retained individual status in the syndicate, there was no entity or association to liquidate when the trading account came to an end. *Walter S. Dickey*, 14 B. T. A. 1295; affd., 56 Fed. (2d) 917; certiorari denied, 287 U. S. 606; *D. H. Byrd*, 32 B. T. A. 568; *John M. Perata*, 33 B. T. A. 843; *Mark L. Gerstle*, 33 B. T. A. 830; affd., 95 Fed. (2d) 587; *Reynolds* v. *McMurray*, 60 Fed. (2d) 843; certiorari denied, 287 U. S. 664; 77 Fed. (2d) 740; *First Mechanics Bank* v. *Commissioner*, 91 Fed. (2d) 275. Accordingly, we find that petitioner's deductible loss was $376,520.38.

---

*Issue as to Simms Petroleum Co. Syndicate.*

Petitioner did not report in his Federal income tax return for 1929 and respondent in determining deficiency did not include any amount in gross income from petitioner's participation in the Simms Petroleum Co. Syndicate. The issue arises upon allegation by respondent in his amended answer that petitioner had additional net taxable income of $95,036.25 from gains, profits and income from the Simms Petroleum Co. Syndicate. Petitioner does not brief this ques-

tion, merely referring to his discussion of a related question (Copper Stocks Trading Account).

### FINDINGS OF FACT.

The facts involved in this issue were stipulated by the parties, as "Stipulation C," which stipulation is adopted as our findings of fact, and made a part hereof by reference; and the facts will be set forth herein only in so far as necessary to a consideration of the issues involved.

### OPINION.

The Simms Petroleum Co. Syndicate was entered by petitioner on or about May 29, 1929.

The Syndicate was extended to October 28, 1929, by the manager under power given in the syndicate agreement, and by agreement with petitioner successively to April 28, 1930, to July 28, 1930, and to the close of business October 27, 1930, at which time it was terminated and he first received returns from the payments made by him.

The question here presented is the same, involving the same syndicate and the same year, as considered in *Pierre S. du Pont, supra.* Therefore, following the conclusion reached by us therein, we hold that the Simms Petroleum Co. Syndicate was a joint venture, from which it follows that petitioner received income therefrom during the taxable year in the sum of $95,036.25.

Reviewed by the Board.

*Decision on all issues will be entered under Rule 50.*

VAN FOSSAN, LEECH, and MELLOTT concur only in the result.

---

STERNHAGEN, SMITH, and MURDOCK dissent from the finding and conclusion that the sale of November 13 was not a true sale, that no loss was thereby sustained, and that the deduction was improperly taken.