T.C. Memo. 2020-9

UNITED STATES TAX COURT

GLENN DAVID CUTHBERTSON a.k.a. DAVID CUTHBERTSON AND
PAMELA CUTHBERTSON, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19871-15.            Filed January 14, 2020.

Ps were engaged in the development of a golf course and surrounding residential housing through several wholly owned entities. In 2009 and 2010, Ps' wholly owned entities engaged in a series of real estate and financial transactions, involving a golf course, that purported to generate losses on the alleged transfer of the golf course property, on the alleged abandonment of the golf course's improvements, and on a sale of promissory notes. In 2009 and 2010, Ps also transferred parcels of real estate from a limited liability company (LLC), which was wholly owned by P-H and P-W and was treated as a non-TEFRA partnership for U.S. income tax purposes, to another LLC that was wholly owned by P-H, via direct and indirect ownership, and that was also treated as a non-TEFRA partnership for income tax purposes. Ps caused the seller LLC to use the installment method of accounting, under I.R.C. sec. 453, so as to defer the recognition of gain on these transfers.

These losses flowed through to Ps, and Ps claimed deductions for these losses on their 2009 and 2010 Forms 1040.  In 2009 Ps also filed a Form 1045, "Application for Tentative Refund", in an attempt to carry back some of these losses to their 2004, 2005, 2006, 2007, and 2008 tax years.  R issued a statutory notice of deficiency that, among other things, determined that Ps were not entitled to certain loss deductions Ps claimed under I.R.C. sec. 165 and determined that Ps incorrectly accounted for the income from the transfers of the real estate lots by causing the LLC to improperly use the installment method.

Held:  Ps are not entitled to deduct the losses arising out of the golf course transfer, property abandonment, and financial transactions.

Held, further, the seller LLC adopted an impermissible method of accounting for the transfers of real estate parcels between the LLCs; therefore, Ps are not allowed to defer the gain from the transferred property to future tax years.

Held, further, Ps did not have reasonable cause for their underpayments of income tax and therefore are liable for I.R.C. sec. 6662 accuracy-related penalties.

William C. Elliott, Jr., and John J. Nail, for petitioners.

Kimberly B. Tyson and James D. Hill, for respondent.

**[*3]**     MEMORANDUM FINDINGS OF FACT AND OPINION

GUSTAFSON, <u>Judge</u>:  By statutory notice of deficiency ("SNOD") dated May 27, 2015, the Internal Revenue Service ("IRS") determined deficiencies in income tax for petitioners Glenn David Cuthbertson and Pamela Cuthbertson for the years 2004, 2005, 2006, 2009, 2010, and 2011,[1] arising from passthrough

---

[1]The SNOD adjusted items for 2011 that affected liabilities for the other years, but the SNOD did not determine a deficiency for 2011; rather, the SNOD stated that it included that year "[f]or information purposes only".  However, the petition ostensibly invokes our deficiency jurisdiction for all the years in the SNOD, and after trial the Commissioner moved to dismiss the petition as to 2011 and to strike the petition's allegations as to 2011.  Under section 6213(a), we do not have jurisdiction to redetermine a deficiency for 2011, and we will therefore grant the Commissioner's motion to dismiss insofar as the petition requests redetermination of a deficiency for 2011.  But the Commissioner acknowledges that we do have jurisdiction under section 6214(b) to "consider such facts with relation to the taxes for [2011] * * * as may be necessary correctly to redetermine the amount of such deficiency" for the other five years in the SNOD.  We will therefore deny the Commissioner's motion insofar as it asks us to strike allegations as to 2011.

[*4] entities owned by them,[2] and section 6662(a)[3] accuracy-related penalties in the following amounts:

| Year | Deficiency | Penalty sec. 6662(a) |
|------|-----------|----------------------|
| 2004 | $175,884 | $35,177 |
| 2005 | 308,175 | 61,635 |
| 2006 | 484 | -0- |
| 2009 | 1,427,186 | 435,863 |
| 2010 | 517,898 | 103,579 |
| 2011 | -0- | -0- |

_____

[2]These entities were partnerships or limited liability companies (LLCs) treated as partnerships. Each had fewer than 10 members or partners; and except in the case of True Homes, LLC, all the partners and members of each were individuals. Generally, we lack jurisdiction to redetermine the partnership items of a partnership if the partnership is subject to the provisions of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, sec. 402(a), 96 Stat. at 648. Blonien v. Commissioner, 118 T.C. 541, 551-552 (2002), supplemented by T.C. Memo. 2003-308; see sec. 6221. However, a partnership qualifies for the small partnership exception under section 6231(a)(1)(B) if it has fewer than 10 partners and all partners are individuals rather than "pass-thru partners" as defined by section 6231(a)(9). As for True Homes, this case does not involve any partnership items of that entity. Therefore, we have jurisdiction over this case and all its issues. Neither party contends otherwise.

[3]Unless otherwise indicated, all section references are to the Internal Revenue Code (26 U.S.C. or "the Code"), as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure. All amounts are rounded to the nearest dollar.

[*5] The Cuthbertsons timely filed a petition in this Court pursuant to section 6213(a) for redetermination of the deficiencies and the penalties in the SNOD. After concessions by the parties, the issues for decision are:

(1) whether for 2009 the Cuthbertsons are entitled to a loss deduction of $100,137 from their wholly owned partnership, Craft Holdings, LLC, from the purported sale of a golf course (we hold that they are not);

(2) whether for 2009 the Cuthbertsons are entitled to a loss deduction of $5,278,404 for the purported sale or abandonment of golf course improvements by their other wholly owned partnership, Craft Development, LLC (we hold that they are not);

(3) whether for 2010 the Cuthbertsons are entitled to loss deductions under section 165(a) in the amounts of $397,575 from Craft Development, LLC, and $1,568,925 from Craft Holdings, LLC, on the purported sale of promissory notes (we hold that they are not);

(4) whether the installment method of accounting was improperly used to report the 2008 and 2009 transfers of real estate parcels from Craft Development, LLC, which was wholly owned by Mr. and Mrs. Cuthbertson, to True Homes, LLC, an entity wholly owned by Mr. Cuthbertson (via his direct ownership and

[*6] indirect ownership via his 100% ownership of Craft Builders, Inc.) (we hold that it was); and

(5) whether the Cuthbertsons are liable for section 6662(a) accuracy-related penalties (we hold that they are).

FINDINGS OF FACT

I.    Petitioners and their entities

Mr. Cuthbertson is in the real estate development business, and he is married to petitioner Mrs. Cuthbertson.  Mr. Cuthbertson incorporated Craft Builders ("Builders") under North Carolina law in December 1991; and he has always been its sole equity owner.  During all relevant periods, Builders was an S corporation for Federal tax purposes.

The Cuthbertsons organized the following LLCs under North Carolina law in the following years:  Craft Development ("Development") in 2003; Craft Holdings ("Holdings") in 2006; Edgewater Golf Club ("EGC") in 2007; and Carolina Development Services ("CDS") in 2008.  As a land development company, Development accounted for land purchases as inventory.

Since at least as early as 2008, Mr. Cuthbertson has held 99% of the equity in Development, Holdings, CDS, and EGC, and Mrs. Cuthbertson has held the remaining 1%.  As relevant to these proceedings, Development and Holdings were

[*7] taxed as partnerships for Federal income tax purposes during the 2008, 2009, and 2010 tax years. Mr. Cuthbertson's intended purpose for Holdings was to hold property which was not intended for developments, while Development was the entity through which he conducted real estate development activities and sold developed properties.

In January 2008 Mr. Cuthbertson organized True Homes as an LLC under Delaware law; and since its formation, he has held 100% of True Homes--59.7% directly and 40.3% indirectly through Craft Builders (of which he is the sole owner).

## II. Petitioners' relatives and their entities

Petitioners have two adult daughters: Crystal Kiker and Sandra ("Sandy") Russell. Sandy is married to Ben Russell, who is therefore petitioners' son-in-law.

Mrs. Kiker and her brother-in-law Mr. Russell formed the following LLCs under North Carolina law: B&C[4] Land Holdings ("B&C I") in December 2008, B&C Land Holdings II ("B&C II") in November 2009, and B&C Land Holdings III ("B&C III") in November 2009. Since its formation, B&C III has had no employees; Mr. Russell and Mrs. Kiker are managers of the entity. All three B&C entities were formed for the purpose of investing in real estate.

---

[4]We assume that "B&C" stands for "Ben [Russell] and Crystal [Kiker]."

**[*8]** III.    <u>Golf course property transactions</u>

      A.    <u>The acquisition, development, and use of Edgewater golf course through 2009</u>

Sometime in the late 1990s, Development purchased 309 acres of property in Lancaster, South Carolina, sometimes referred to as "Edgewater Phase 1". In November 2003 Development purchased 1,032 acres of land in Lancaster for $4.2 million, sometimes referred to as "Edgewater Phase 2". In January 2005 Development purchased another 561 acres of land in Lancaster for $3.9 million, sometimes referred to as "Edgewater Phase 3". The borders of these three properties met across much of their acreage.

Approximately 154 acres of raw land within Phase 2 and Phase 3 of the Edgewater properties was chosen to be the site of what is now the Edgewater golf course. The golf course was intended to enhance the value of residential real estate in the Edgewater community. The golf course and the residential properties were developed accordingly, but in that process the intended purposes of Mr. Cuthbertson's entities, their actual roles, and important details of their agreements became confused, as we show here.

For the three years 2006 through 2008, it was Development that created the Edgewater golf course. However, in November 2006 Development signed a deed

[*9] transferring all 1,032 acres of Edgewater Phase 2 real estate to Holdings; the deed was recorded in June 2007. In March 2007 Development signed a deed transferring all 561 acres of Edgewater Phase 3 real estate to Holdings. Together, these two transfers included the 154 acres that underlay the Edgewater golf course. Development's transfer of the Edgewater Phase 2 parcel to Holdings was recorded in the public records of Lancaster County, South Carolina, in June 2007, and in March 2007 the transfer of the Edgewater Phase 3 parcel was recorded in the public records of Lancaster County, South Carolina. With respect to the 154 acres of land that would become the golf course, Holdings recorded on its books the basis of the portion (107 acres) of Edgewater Phase 2 as $432,740 and the basis of the portion (47 acres) of Edgewater Phase 3 as $327,397, totaling $760,137. Thus, for much of this three-year period (starting in November 2006), Development was building a golf course on land to which it no longer held title, and to which no contemporaneous agreements suggest that Development owned the improvements it was building.

During those same three years, Development also constructed a building that was used as a clubhouse for the golf course, and this clubhouse was constructed on part of the land, outside the 154 acres that made up the golf course, that Development had transferred to Holdings.

**[\*10]** In April 2008 EGC executed a lease agreement to become the tenant of the Edgewater golf course premises. Although it was Holdings that held legal title to the 154 acres underlying the golf course (and the rest of Phase 2 and Phase 3), the lease agreement purported to name Development as the lessor.[5] That is, Development was ostensibly the landlord of property that in fact it did not own. This lease charged EGC a one-time rental fee of $1 and stated that the landlord is responsible for paying the real estate taxes associated with the leased property and that the lessee is responsible for the costs of insurance, utilities, services, repairs, and maintenance. The Edgewater golf course has operated without interruption since August 2008.

      B.     <u>The December 2009 Land Purchase Agreement between Holdings and B&C III for the Edgewater golf course</u>

Mr. Cuthbertson believed that, beginning in 2005, residential sales were "pretty good" but that the real estate market "came to a halt" around the same time that the Edgewater golf course opened in or around 2006 or 2007. The real estate market experienced a severe downturn late in 2007, and the poor market continued

---

[5]By April 2008 Holdings was the owner of the 154 acres of land underlying the golf course. Mr. Cuthbertson testified that he believed at the time that Development was the owner of the improvements on that land. We find, however, that in fact he did not actually realize which entity owned the land or the improvements.

[*11] throughout the years in issue. In the midst of this downturn, several institutions that had lent money to the Craft entities pressured Mr. Cuthbertson to "get * * * [the golf course property] off the books".

In November 2009 Mr. Cuthbertson hired an appraiser to value the golf course property. The resulting appraisal assigned a value of $660,000 to the 154-acre golf course real estate and a value of $490,000 to furniture, fixtures, and equipment.[6]

On December 29, 2009, Holdings, as "Seller", entered into an agreement entitled "Land Purchase Agreement (Contract for Deed)" (the "LPA") with, as "Buyer", B&C III (one of the entities owned by Mrs. Kiker and Mr. Russell), purporting to sell the Edgewater golf course to B&C III for $660,000. The LPA was apparently never recorded in the public records.[7] Before Holdings entered

---

[6]This valuation allocated no "value for Business Value associated with the operations [of the golf course]", and the appraiser further disclaimed the accuracy of the $490,000 valuation for the furniture, fixtures and equipment ("FF&E") because he was "not experienced or qualified in the valuation of equipment and recommends to the client the use of a professional qualified in equipment and FF&E valuation for an accurate estimate of the market value for this component of the subject operations, if needed."

[7]Although the parties stipulated the recording of the deeds that evidence Development's sales of Phase 2 and Phase 3 to Holdings, they did not stipulate the recording of the LPA. Those deeds bear on their first pages the stamps showing their recording; but the copy of the LPA entered into evidence by stipulation bears

(continued...)

[*12] into the LPA, Mr. Cuthbertson did not seek Mr. Russell's credit score, B&C III's credit score, or B&C III's tax return. B&C III did not have any liquid assets when it entered into the LPA. The Cuthbertsons' real estate attorney, Wesley Hinson, testified that the LPA was a contract for deed prepared for the conveyance of the golf course, and was used as an alternative method for seller financing that "fits a need where certain facts exists [sic]". Under the LPA, B&C III was not required to make (and did not make) a downpayment, and B&C III's obligation to "exercise its right to purchase the Property from Seller" would "mature and come due on or before" December 31, 2014, when B&C III would be obligated to tender the purchase price, along with annual interest of 6%, and Holdings would execute the special warranty deed. On or before the closing of the purchase contemplated by the LPA, Holdings (as "Seller") was required to pay the amounts necessary to release the property from three mortgages that encumbered the subject property (totaling $10.4 million).[8] From the date of the LPA (December 29, 2009) until the

---

[7](...continued)
no such stamp, nor does the settlement statement corresponding to the LPA indicate that fees were collected for the recording of the LPA. Thus we lack this assurance.

[8]Thus, under the LPA, Holdings would transfer title to B&C III after receiving B&C III's payment but, in the meantime, would retain legal title. The LPA provided that, before payment was made, "Seller [i.e., Holdings] may transfer
(continued...)

[*13] closing date, the LPA obligated the Buyer (B&C III) to, inter alia, pay the real estate taxes, pay the utilities, pay the insurance, and maintain the property. In the meantime, B&C III issued to Holdings a $660,000 unsecured note that was "given for money borrowed", which (for reasons the record does not explain) provided for interest payable at 5.0% per annum, rather than the 6.0% interest rate specified in the LPA. (As set out below in part V.B, Holdings subsequently sold the B&C III note less than a year later to a third party, David Tucker, not for $660,000 but for $95,700--14.5% of its face value.)

The LPA provides that the property with which it is concerned is the area of land "more particularly described on 'Exhibit A' attached hereto [i.e., evidently the 154 acres of the golf course], and any improvements located thereon". The "improvements" consisted of the features of the golf course (tees, holes, greens, fairways, hazards, etc.) that Development had built and that had never been conveyed to Holdings. The property description of the LPA did not include the clubhouse or the land on which it was built.

---

[8](...continued)
legal title to the property without Buyer's consent. If Seller transfers legal title, Seller will require the transferee to assume Seller's obligations in this contract, and the transfer and assumption of obligations by the transferee will release Seller from all obligations to Buyer."

[*14] Five years after executing the LPA, Holdings transferred the golf course real property to B&C III by deed on December 31, 2014. However, at that time B&C III had not tendered the purchase price plus interest, as the LPA purportedly required. Rather, Holdings had sold the note to Mr. Tucker for $95,700, and B&C III did not begin making payments under the note until 2015. And even as late as November 2016, B&C III had paid a total of only $68,000 under the note, including interest.

Mr. Cuthbertson testified that his understanding of the arrangement was "that if there's some upside to the land sometime down the road, that there would be a sharing in the profits, which hasn't come yet but that was the intent from day one." However, the LPA has no such provision; and Mr. Russell, in contrast, testified that if B&C III were to sell the golf course at a profit, he would not need to share any of that profit with Mr. Cuthbertson.

C.  Related transactions

In selling the golf course to B&C III, one of Mr. Cuthbertson's expectations was that one of his entities (such as EGC) would continue to manage the golf course. Consistent with that expectation, on December 31, 2009 (i.e., two days after the execution of the LPA), Mr. Cuthbertson executed, as managing member of Development, a bill of sale purporting to sell to EGC various pieces of

[*15] equipment used to maintain the golf course. As manager of EGC, he also executed a note by EGC in the amount of $25,000 in favor of Development.

Also consistent with Mr. Cuthbertson's expectation, EGC and B&C III entered into an agreement entitled "Edgewater Golf Lease Agreement" on January 19, 2010 (i.e., less than a month after the LPA), by which EGC purportedly leased the Edgewater golf course from B&C III. The lease obligated EGC to pay rent of $1 per year, plus 25% of annual net profits over $100,000, and 50% of annual net profits over $250,000--though EGC's records had reflected operating losses for 2008 and 2009 (and would continue to reflect losses through 2015). The lease also obligated EGC as lessee to pay for maintenance, insurance, utilities, and taxes[9] associated with the golf course, except that maintaining "capital improvements" was ostensibly B&C III's obligation as lessor. That is, the Lessee (EGC) was allegedly responsible for maintaining the premises, buildings, and equipment that were the subject of this lease; maintaining the golf course; and

---

[9]Although section 10 of the B&C III and EGC lease agreement is entitled "Utilities; Taxes", it makes no mention of taxes. Rather, the lessee is obligated to pay only for utilities and "all other costs and expenses of every kind whatsoever of or in connection with the use, operation, and maintenance of the premises and all activities conducted thereon", and it is not clear whether real property taxes would fall into that category. Under the LPA the Seller (Holdings) was obliged to pay real estate taxes through 2009. After that date, the Buyer (B&C III) was responsible under the LPA for "all property taxes and hazard insurance on the Property".

**[*16]** employing or contracting for the purpose of insuring adequate care of the golf course and "all systems related thereto". This provision conflicts with some of the responsibilities subsequently enumerated for the Lessor (B&C III), which was ostensibly responsible for maintenance, repair, and replacement of, among other things, parking lots, cart paths, ponds, the drainage system, the irrigation system, course lighting, the electrical system, and the golf course maintenance building. Some of these items that B&C III was obliged to maintain would apparently fall under the category of "all systems related thereto" that EGC was obliged to maintain. In his decision to have B&C III buy the golf course, Mr. Russell was (he testified) "absolutely" influenced by the fact that one of Mr. Cuthbertson's entities, as tenant of a lease agreement, rather than B&C III, would be paying the operating expenses of the golf course.

Under the December 2009 lease, EGC indemnified B&C III for any type of intentional or unintentional tort liability arising from the golf course property (in contrast to the earlier lease, which provided that "Landlord [Mr. Cuthbertson] and Tenant [EGC] agree to hold each other harmless, and each will carry general liability coverage."

**[*17]** D.    Payment, nonpayment, and reimbursement of expenses

Despite the fact that the clubhouse was still owned by Holdings--i.e., had not been purchased by B&C III and thus could not have been leased by B&C III to EGC--the clubhouse continued to be used by golfers at the Edgewater golf course. There is no evidence of any lease agreement for the clubhouse between EGC and Holdings (or any other entity) nor of EGC's paying rent for the clubhouse to any entity.

In 2010 and 2011, EGC paid the maintenance and repair, utilities, and insurance expenses for the Edgewater golf course. B&C III thus did not pay those expenses, which the lease had allocated to EGC; but B&C III also paid no capital improvement expenses from 2009 through at least October 2012, despite its supposed obligation to do so under the LPA and the January 2010 lease.

In 2009, 2010, and 2011, Holdings paid property taxes for the golf course, which it had ostensibly sold in December 2009. Only after the IRS began an audit of these entities and raised a question about tax payments did B&C III pay Holdings $36,923 in November of 2012, apparently to reimburse Holdings for the property taxes that Holdings had paid after the execution of the LPA. At the same time, EGC paid B&C III the same sum, apparently for the same reason.

[*18] The first evidence of any payment or expenditure made by B&C III after it entered into the December 2009 LPA appears in the form of two purchase orders (on a letterhead that has both Development's and EGC's names at the top), dated October 30, 2012, for materials and labor to install irrigation behind the number 1 tee, totaling $4,000--with a handwritten statement at the top of both invoices, "Capital Improvement to be paid by B&C III".

E.    December 2014 "Addendum"

We have pointed out anomalies in the foregoing transactions--i.e., Development's development of a golf course on land it did not own; Development's purported lease to EGC in April 2008 of the golf course it did not own; the December 2009 LPA by which Holdings agreed to convey a deed to B&C III for the golf course, in exchange for no consideration, other than an unsecured promissory note; and the purported January 2010 lease with terms with which B&C III and EGC made no attempt to comply until after the Cuthbertsons became aware of the IRS audit[10]--and apparently Holdings, Development, and B&C III became aware of these anomalies.  On December 15, 2014, those three

_____

[10]At the very latest, the Cuthbertsons were aware of the IRS audit on March 6, 2013, the date by which they were preparing financial statements and corresponding with IRS agents--a date only four months before the IRS issued to the Cuthbertsons a Form 5701, "Notice of Proposed Adjustment", dated July 2, 2013.

[*19] entities executed an "Addendum to Land Purchase Agreement" (the "Addendum"), apparently in an attempt to address these anomalies. The Addendum states: "Although Development was not an original party to the LPA, it was the Parties [sic] intent for beneficial ownership of the Improvements to transfer to Buyer pursuant to the LPA." Under the Addendum, B&C III agreed to pay Development $100, and Development "acknowledge[d] and agree[d]" that it abandoned all interests in the improvements upon the Edgewater golf course--not as of the date of the December 2014 Addendum, but retroactively as of the date of the December 2009 LPA. On December 31, 2014, B&C III paid Development $100, via a check which bears the notation "Addendum related to sale of golf course". On the same date, Mr. Cuthbertson, as manager of Holdings, transferred to B&C III title to the Edgewater golf course, in ostensible fulfillment of the terms of the LPA (although B&C III had not yet paid the purchase price).

IV.  Reporting of the Edgewater land sale on 2009 tax returns

On its 2009 Form 1065, "U.S. Return of Partnership Income", Holdings reported a $3.2 million total loss, which included a loss from the alleged sale of the underlying golf course land in the amount of $100,137 (reflecting its claimed basis of $760,137 in the land minus the $660,000 of consideration stated in the LPA). On its 2009 Form 1065, Development reported a loss of $8.9 million,

[*20] which included a claimed $5.3 million loss on the improvements to the Edgewater golf course, reflected on its Form 4797, "Sales of Business Property" (emphasis added), consistent with Development's records, which characterized it as a "mass sale". On line 10 of that form, under the following terms, Development described the land sale with the following responses: (1) "Description of property"--"Disposals for 2009"; (2) "Date acquired"--"Various"; (3) "Date sold"--"December 29, 2012"; (4) "Gross sales price"--"25,000"; (5) "Depreciation allowed or allowable since acquisition"--"$1,071,710"; (6) "Cost or other basis, plus improvements and expense of sales"--"6,409,521"; and (7) "Gain or (loss)"--"-5,312,811". Holdings and Development issued Schedules K-1, "Partner's Share of Income, Deductions, Credits, etc.", to the Cuthbertsons, and on Schedule E, "Supplemental Income and Loss", of their 2009 joint Form 1040, "U.S. Individual Income Tax Return", the Cuthbertsons reported nonpassive losses of $12.5 million from these Schedules K-1. That amount includes the total reported loss of $8.9 million from Development, and the total $3.2 million loss from Holdings (which also evidently include other losses not disputed by the Commissioner in this case).

For 2009 the Cuthbertsons also filed with the IRS a Form 1045, "Application for Tentative Refund", followed by a second, superseding Form 1045. On the Forms 1045, the Cuthbertsons claimed a net operating loss ("NOL")

[*21] carryback of $1.89 million, which is calculated using the $2.3 million loss reported on their 2009 return (which was derived from the losses passed through to them by Development and Holdings). The Cuthbertsons' Form 1045 applied that NOL for the 2004, 2005, and 2006 tax years (three to five years before the 2009 tax year), which had the effect of decreasing the Cuthbertsons' tax liability for 2004 by $176,000 and for 2005 by $309,000.

V.     Bulk notes sale

A.     The 14 notes

In December 2010 Development, Holdings, and CDS held 14 different notes that had been made between January 1, 2009, and April 1, 2010, by one of Mrs. Kiker, Mr. Russell, B&C I, or B&C III. One of these was the $660,000 note that Holdings had received from B&C III for the Edgewater golf course. The total face amount of the 14 notes was $2,925,000; and as of December 2010, the notes had a total outstanding principal amount, and adjusted tax basis, of $2.8 million. All of the notes (before modification) were to mature in 2014 or early 2015. Three notes were originally issued with a 5.00% interest rate and two others were originally issued with a 0.75% rate, which remained unchanged at the time Mr. Cuthbertson sold them to Mr. Tucker. The remaining nine notes had been,

**[\*22]** while held by Mr. Cuthbertson, modified so as to reduce their interest rate to 0.75%.

Mr. Cuthbertson testified that he made no collection efforts on the notes from his daughter, that banks said they did not view the notes as having "real liquid equity", and that the notes "basically ha[d] zero value because there's no income being generated on those, and I couldn't force revenue because there was no revenue to generate from the people I had the notes from". As with the Edgewater golf course, Mr. Cuthbertson testified that his lenders wanted the Craft entities to liquidate the notes from his daughter and son-in-law and their B&C entities.

### B. The sale of the notes

David Tucker has been a friend of Mr. Cuthbertson and was a business partner with Sandy Russell (i.e., Mr. Cuthbertson's daughter and Mr. Russell's wife). On December 1, 2010, Mr. Tucker agreed to buy the 14 notes (totaling $2.8 million) in a document entitled "Bulk Note Purchase Agreement", for a total of $406,000. That agreement gave Mr. Tucker until December 31, 2010, to complete any due diligence on the notes, and until March 15, 2011, to tender the purchase price. The Bulk Note Purchase Agreement also provided: "If notice is not given to Seller of rejection of the Agreement within this time frame this

[*23] Agreement becomes enforceable." However, Mr. Tucker testified that he did not review a credit score or tax return records for any of the notes' makers, and that he knew the loans were unsecured. Mr. Tucker executed the agreement on his own behalf, and Mr. Cuthbertson countersigned on behalf of Development, Holdings, and CDS. At trial Mr. Cuthbertson was not able to articulate how he settled on a price of $406,000. Of the $406,000 paid for the 14 notes, Mr. Tucker and Holdings allocated $95,700 to the sale of the $660,000 note made by B&C III for the sale of the golf course.

On the same date that Mr. Tucker entered into the Bulk Note Purchase Agreement, Mr. Tucker and Mr. Cuthbertson in his personal capacity entered into another agreement that gave Mr. Cuthbertson the option to repurchase the 14 notes from Mr. Tucker for $487,000, and the option lasted until the maturity date of each note.[11] Mr. Cuthbertson did not exercise his option to repurchase the 14 notes (although following the modifications of January 2014, discussed below in part V.D, none of the notes will reach maturity until December 2019, so that even by the time of trial in this case the options appeared not to have lapsed).

---

[11]The repurchase option agreement did not clarify how to reconcile the fact that the agreement recites one price for all the notes but contemplates repurchase of fewer than all of the notes (with no price specified for individual notes).

[*24] C.     Simultaneous lot purchase agreement

Also on the same date that the Bulk Note Purchase Agreement was entered into (December 1, 2010), Mr. Tucker (along with his wife, Vada Tucker) and Mr. Cuthbertson entered into a land sale contract entitled "Lot Purchase Agreement". Mr. Cuthbertson entered into the Lot Purchase Agreement in order to induce Mr. Tucker to purchase the notes. The Lot Purchase Agreement provided that, for the consideration of "the promises made by each party to the other, as well as the sum of $1.00", Mr. Cuthbertson would, on or before March 31, 2014, purchase from Mr. Tucker a 50% tenancy in common interest in one plot of real estate, and 100% in another plot of real estate, for $412,000, but that Mr. and Mrs. Tucker could buy the parcels back from Mr. Cuthbertson for $412,000 plus 15% of that amount at any time on or before December 31, 2015.

At some later date, Mr. Tucker found another buyer willing to pay cash for the property that Mr. Cuthbertson was supposed to receive under the Lot Purchase Agreement, and Mr. Cuthbertson agreed to allow Mr. Tucker to substitute another parcel of real estate in lieu of both pieces originally described in that agreement.

On March 16, 2011--one day after the purchaser's last date to close on the purchase specified in the Bulk Note Purchase Agreement, Mr. Tucker wired

[*25] $406,000 to Mr. Cuthbertson, and Mr. Cuthbertson signed a bill of sale stating that title to the 14 notes was transferred to Mr. Tucker.

The simultaneous Bulk Note Purchase Agreement and Lot Purchase Agreement were not symmetrical, but they do appear to have broadly offset each other, at least for some time after they were executed: Mr. Tucker paid $406,000 to Mr. Cuthbertson under the one, and Mr. Cuthbertson paid $412,000 to Mr. Tucker under the other. Mr. Cuthbertson had an option to undo the one, and Mr. Tucker had an option to undo the other. And the transactions were not acted on or enforced with any rigor.

D. Subsequent modification of notes

On January 2, 2014, Mr. Tucker modified all 14 of the notes he purchased from the three Craft entities by extending their maturity dates until either 2019 or 2020. Several of the modifications recite that the original notes had matured and were defaulted on. Mr. Tucker testified that his consideration for extending the loans' maturity date was "to give him more time", and that he received "nothing monetarily other than if I gave him longer time, I would stand a better chance of getting it." In addition to postponing the maturity date of the loans, the modifications reduced some of the interest rates: For the three loans that had

[*26] interest rates in excess of 0.75% when Mr. Tucker purchased them, the January 2014 modifications reduced the interest rates from 5.00% to 0.75%.

Mr. Tucker testified that he received no payments of interest or principal under the notes in 2011 through 2014 and that "I did receive interest's payment in 2015 when things got a little better, but it was to catch up some of the interest from the previous years." When asked how he responded to interest's not being paid on the notes, Mr. Tucker testified: "Nothing. The world was still gone south, you know. In other words, nobody had [any] money so there was really nothing I could do at that time." When asked at trial whether he would have considered suing any of the notes' makers for nonpayment, Mr. Tucker testified: "I figured he will pay even if I have to modify it to give him time", before clarifying that "he" referred to B&C III or Mr. Russell; and he stated that he did not think Mr. Russell would want to hurt his relationship with Mr. Tucker or Mr. Cuthbertson by failing to pay the notes.

E.    Reporting of bulk notes sale

On their 2010 Forms 1065, Development, Holdings, and CDS claimed that the 2010 bulk notes sale gave rise to a $2.4 million loss, $1.57 million of which

[*27] was claimed by Holdings, and $400,000 of which was claimed by Development.[12] These losses, in turn, were reflected on Schedule E of the Cuthbertsons' 2010 Form 1040, which reflects total nonpassive losses from Schedules K-1 of $5.5 million, and total partnership and S corporation income of $167,000 after application of those losses.

VI.     Lot transfers and sales from Development to True Homes

Development transferred two parcels of real estate to True Homes in 2008 and transferred a third parcel to True Homes in 2009. In January 2009 Development also sold two other parcels of real estate to Mr. Russell and Mrs. Kiker (jointly, in their individual capacities). Development deferred a portion of the income from the transfer of five parcels[13] of real estate in 2008 and 2009. For income tax purposes, Development reported for 2008 the non-deferred portion of income (i.e., $684,000) of the two 2008 transfers valued at $1.27 million; and reported for 2009 the non-deferred portion (i.e., $1.84 million) of the 2009 transfer valued at $3.6 million. However, Development did not report installment sale

---

[12]The remaining amount of the $2.4 million loss, reported on CDS's return, was not disallowed by the IRS in its SNOD.

[13]In the SNOD the IRS disallowed the deferral of the revenue from all five of these sales. As to the parcels transferred to Mr. Russell and Mrs. Kiker, because the Cuthbertsons did not raise this issue at trial or on brief, we treat this issue, with respect to these parcels, as conceded.

[*28] treatment for any of these transactions, nor did it file a Form 6252, "Installment Sale Income", with its returns.[14] Development's 2009 Schedules K-1 issued to Mr. Cuthbertson and Mrs. Cuthbertson indicate that neither received distributions from Development during that year.

Consistent with its 2008 and 2009 tax returns, Development's 2009 and 2010 audited financial statements report that deferred revenue of $2.8 million and $1.8 million, respectively. Mrs. Privette, the chief financial officer for Mr. Cuthbertson's real estate entities, entered the difference between the properties' book values or bases (that is, their historic costs) and their fair market values at the time of transfer in Development's accounting records as "deferred revenue".[15]

---

[14]The 2008 return is not in evidence; but the 2009 return lacked the Form 6252, and the Cuthbertsons do not allege that the 2008 return included Form 6252. Mr. Cuthbertson's accountant, return preparer, and auditor, Thomas Moyer, explained that they did not elect installment sale treatment for these transfers because "it was simply a capital distribution and a re-contribution to another entity owned in the same manner." To the extent, if any, that his reasoning behind the non-election is relevant, we are not at all convinced that the proffered reason was actually involved in the decision. If the transfers were "simply a capital distribution and a re-contribution to another entity", then presumably none of the proceeds should have been reported as income.

[15]The record does not reflect when, if ever, True Homes disposed of the three tracts of real estate that Development transferred to it in 2008 and 2009; however, Mr. Moyer and Mrs. Privette testified that whenever that happened, they would have reported any gain on such dispositions at that time as gain to Development.

**[*29]** VII.   Return preparation

The Cuthbertsons engaged Mr. Moyer's accounting firm, Moyer, Smith, and Roller, to prepare their personal tax returns as well as those of their business entities for the years in issue.  After hearing Mr. Moyer's testimony, we are unable to find facts as to what information he asked for and what the Cuthbertson's provided for the reporting of the transactions giving rise to the disputed adjustments in this case.

VIII.  Notice of deficiency

The IRS audited the Cuthbertsons' entities' 2009, 2010, and 2011 tax returns.  As part of that process, the immediate supervisor of the IRS's examining agent signed a penalty approval form on August 30, 2013.  Having determined deficiencies, on May 27, 2015, pursuant to section 6212(a), the IRS mailed an SNOD to the Cuthbertsons. The SNOD determined deficiencies for 2009 and 2010, and made correlative adjustments for losses that the Cuthbertsons carried back to their 2004, 2005, and 2006 tax years.  The SNOD indicates an adjustment by the Commissioner of $9 million to the Cuthbertsons' Schedule E for 2009; $1.4 million to their Schedule E for 2010; and $96,000 for 2011.

**[*30]** With respect to Holdings, the SNOD specified that an adjustment of $100,137 was necessary for the Golf Course Transaction for the 2009 tax year, and an adjustment of $1,568,925 was necessary for the Note Sale.

With respect to Development, the SNOD specified that for the 2009 tax year, an adjustment to Development's income of $5,278,404 was necessary to correct for the treatment of the golf course transaction on Development's Form 4797. The SNOD also indicated that an adjustment for Development's 2010 tax year of $397,575 was necessary for the Note Sale, and it determined that correction of the use of the installment sale treatment to defer income during the 2009, 2010, and 2011 tax years required adjustments to income of $2,803,411, $975,299, and $78,289, respectively.

The SNOD also determined that the Cuthbertsons are liable for accuracy-related penalties for both 2009 and 2010. (The SNOD also made other adjustments that were subsequently conceded by the parties and therefore are no longer at issue in this case.)

The Cuthbertsons timely mailed their petition to this Court on August 5, 2015. At the time they filed their petition, the Cuthbertsons lived in North Carolina.

**[*31]**                                   OPINION

I.      Burden of proof

In general, the IRS's statutory notice of deficiency is presumed correct, "and the petitioner has the burden of proving it to be wrong". Welch v. Helvering, 290 U.S. 111, 115 (1933); see also Rule 142(a). Section 7491(a) provides circumstances in which that burden may shift, but the Cuthbertsons do not invoke that provision. Rather, they argue that the Commissioner bears the burden of proof in this case because the SNOD does not provide the legal or factual basis for its adjustments. Their argument is that, because the SNOD was not sufficiently particular as to the factual or legal basis for the Commissioner's determination, "the Cuthbertsons were required to present differing evidence at trial to argue against every possible ground for disallowance."

Section 7522(a) requires that a notice of deficiency "describe the basis for * * * tax due". Rule 142(a) provides that the Commissioner bears the burden of proof with respect to "any new matter". "[W]here a notice of deficiency fails to describe the basis on which the Commissioner relies to support a deficiency determination and that basis requires the presentation of evidence that is different than that which would be necessary to resolve the determinations that were

[*32] described in the notice of deficiency", the Commissioner bears the burden of proof. Shea v. Commissioner, 112 T.C. 183, 197 (1999).

A new theory that "merely clarifies or develops the original determination is not a new matter". See Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 507 (1989). But a new theory that either "alters the original deficiency or requires the presentation of different evidence" is a new matter. Id. The Cuthbertsons have failed to explain how the Commissioner's arguments in this case do more than clarify or develop the determinations in the SNOD, and they have not explained how any evidence they would have needed to counter the Commissioner's contentions here differed from what would have been necessary to resolve the determinations described in the SNOD. The Cuthbertsons therefore bear the burden of proof.

## II. General legal principles

### A. Reporting partnership tax items

Sections 702 and 1366 provide that partners of partnerships (or, as here, LLCs taxed as partnerships under subchapter K) and shareholders of S corporations (such as Builders) are taxed on the tax items realized initially by the entities in which they hold equity interests. Because the Cuthbertsons filed joint tax returns for 2009 and 2010, and Development, Holdings, and CDS were

[*33] owned entirely by them, the tax items initially reported by those entities ultimately were taken into account by the Cuthbertsons on their personal returns.

B.   Loss deductions

Section 165(a) provides:  "There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise."  Regulations provide that for a loss to be deductible under section 165, "a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and * * * actually sustained during the taxable year. Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss."  26 C.F.R. sec. 1.165-1(b), Income Tax Regs. (emphasis added).

"[F]amily tax planning is permissible.  However, an intra-family transaction will be closely scrutinized".  Royster v. Commissioner, T.C. Memo. 1985-258, 49 T.C.M. (CCH) 1594, 1605 (1985), aff'd, 820 F.2d 1156 (11th Cir. 1987); see Barnes Grp., Inc. v. Commissioner, T.C. Memo. 2013-109, at *51 (the transaction "was executed between related parties and therefore deserves extra scrutiny"), aff'd, 593 F. App'x 7 (2d Cir. 2014).  If that scrutiny reveals that family members did not actually govern their affairs in accord with agreements that they purported to enter into, then we will not respect those agreements more than they did.

**[\*34]** The parties' legal arguments in this case can largely be characterized as pertaining either to the rules governing <u>whether</u> a taxpayer is entitled to a loss deduction upon disposing of an asset,[16] or to the Code's tax accounting rules governing <u>when</u> a tax item is properly taken into account. We address each in turn below.

III. <u>Deductibility of losses from the Edgewater golf club transfer and the bulk notes sale</u>

    A.   <u>Holdings' claimed loss on the 2009 sale of the golf course</u>

In 2009 Holdings held title to the 154 acres underlying the golf course, for which its claimed basis was $760,137. It purported to sell that land to B&C III for $660,000 (the value at which it had been appraised) and therefore claimed a loss deduction of approximately $100,000. While the parties do not dispute that the LPA did not convey legal title to B&C III in 2009, the Cuthbertsons contend that the sale nonetheless closed in the 2009 tax year because the benefits and burdens of owning the golf course land passed to B&C III. We hold, however, that Holdings is not entitled to deduct this claimed loss for two factually related and overlapping reasons: First, B&C III did not actually assume the benefits and

---

[16]The Commissioner has not invoked application of section 267 or section 707(a)(2)(B) to the intrafamily transactions at issue.

**[\*35]** burdens of ownership of the land; and second, the purported sale lacked economic reality.

      1.    <u>Development's assumed ownership of the golf course improvements</u>

To address two of the issues in this case--Holdings' claimed loss on the sale of the golf course (discussed here in part III.A), and Development's claimed abandonment loss from the golf course improvements (discussed below in part III.B)--we must inquire who owned the golf course improvements.

Necessary to the Cuthbertsons' litigating position that Development abandoned the improvements (and necessary to its reporting position that it sold them) is the proposition that Development <u>owned</u> the improvements, and the Cuthbertsons contend that it did. However, it is undisputed that Development passed to Holdings legal title to the golf <u>course</u> in 2006 and 2007 <u>without</u> any express retention of the improvements that it had built thereon and <u>without</u> any documented understanding about ownership of the improvements that Development continued to make on the property thereafter. But the Cuthbertsons contend that, under State law, Development became a "tenant at will" of Holdings on the golf course property after it transferred the golf course land to Holdings and

**[\*36]** that as a tenant Development could and did therefore own the improvements it made on the property.

The Commissioner urges the general proposition that "[r]eal property improvements run with the land" and disputes Development's status as a "tenant at will". To resolve this dispute would require us to determine whether the facts about these transactions and dealings among related entities support the existence of an undocumented tenancy and whether State law does, as the Cuthbertsons contend, give to the tenant ownership of improvements that he builds.

However, we conclude that we do not need to definitively resolve this question. As we show below, even if we assume that the Cuthbertsons' position is correct and that Development <u>did</u> own the golf course improvements, we must hold in favor of the Commissioner on both Holdings' claimed loss on the sale and Development's claimed abandonment loss. We therefore proceed on the assumption that Development did own the golf course improvements--but this assumption in favor of the Cuthbertsons creates insuperable difficulties for them on the issue of Holdings' claimed loss on the sale, which we now address.

**[*37]**      2.      <u>Benefits and burdens</u>

Caselaw guides our analysis with regard to when a sale is complete for tax purposes. In the context of real property, "a sale and transfer of ownership is complete upon the earlier of the passage of legal title or the practical assumption of the benefits and burdens of ownership." <u>Keith v. Commissioner</u>, 115 T.C. 605, 611 (2000). While Holdings claimed a loss on the sale of the land underlying the Edgewater golf course in 2009, Holdings did not actually transfer legal title to the property to B&C III until December 2014, so we must decide whether these instruments confer upon B&C III the benefits and burdens of ownership. Consequently, in order for Holdings to have incurred a taxable loss in 2009, B&C III must have practically assumed the benefits and burdens of ownership of the Edgewater golf course land.

In similar cases, we have considered the following factors as "indicative of the benefits and burdens of ownership":

> A right to possession; an obligation to pay taxes, assessments, and charges against the property; a responsibility for insuring the property; a duty to maintain the property; a right to improve the property without the seller's consent; a bearing of the risk of loss; and a right to obtain legal title at any time by paying the balance of the full purchase price. * * *

**[*38]** Id. at 611-612.  In determining whether the benefits and burdens of ownership practically shifted to B&C III, we consider all of the relevant facts and circumstances.  See Clodfelter v. Commissioner, 426 F.2d 1391, 1393 (9th Cir. 1970) ("The transaction should be regarded in its entirety"), aff'g 48 T.C. 694 (1967).

Application of these factors in the instant case is complicated by the fact that the LPA purports to transfer from Holdings to B&C III both the land and the "improvements" thereon, whereas Holdings could not transfer title, or contract to convey title, to B&C III for the improvements, which (the Cuthbertsons contend and we assume) Holdings did not own.  If B&C III somehow obtained the benefits and burdens of the improvements, it did not obtain them through the LPA.  For several of the benefits and burdens it is difficult to distinguish the land underlying the golf course from the golf course and to decide whether (for example) B&C III obtained from Holdings the right to possess the golf course land but not the improvements, the responsibility to maintain the land but not the improvements, and to bear the risk of loss from the land but not from the improvements.  Consequently, even if we found that some benefits and burdens passed to B&C III under the LPA, B&C III did not obtain the benefits and burdens of the

[*39] "improvements" (assumed to have been owned by Development) that were an ostensible subject of the LPA, since Development was not a party to the LPA.

Under the transactions among these related parties taken as a whole, B&C III ultimately lacked the "benefits and burdens" as measured by the Keith factors: Under the terms of the January 19, 2010, lease with EGC, B&C III contracted away some of the responsibilities that it bore under the LPA. The new lease with B&C III as the landlord, required that EGC as lessee have the "responsibility for insuring the property". EGC (rather than Development and B&C III) was obligated under both leases to maintain the property, other than "capital improvements", even after the purported sale. The lease between EGC and B&C III allocated to EGC the "risk of loss", at least by way of tort liability and property damage.

We assume that, when a purchaser of property is dealing at arm's length with unrelated parties, he may be seen as obtaining and bearing the burdens of ownership even if his manner of bearing those burdens is to find a lessee who will contract to bear them for him.[17] In this case, however, B&C III stepped into a

---

[17]In Frank Lyon Co. v. United States, 435 U.S. 561, 575 (1978), the Supreme Court respected the parties' sale and leaseback arrangement, holding that "the transaction, as it ultimately developed, was not a familial one"; rather it was a genuine multiple-party transaction with economic substance which is compelled or

(continued...)

**[\*40]** prearranged agreement in which it acquired ostensible property rights from a related party for no money down and became the lessor to a party related to the seller that had already been operating the property and that had borne and would continue to bear the burdens of ownership. Practically speaking, B&C III took on no burdens.

Moreover, the lease between B&C III and EGC also set forth the requirement that all insurance policies "shall be written in a form satisfactory to and approved by Lessor" (i.e., by B&C III) and the policies "shall be issued by insurance companies satisfactory to Lessor." There is no evidence in the record that EGC obtained and maintained the types of insurance policies required by the lease; and more importantly, as it concerns the benefits and burdens analysis, the record lacks any evidence that B&C III undertook its duties to approve the insurance policies and insurance companies that underwrote the policies. Additionally, because B&C III had not paid any money under the LPA and had not yet accepted legal title, if something catastrophic occurred, then B&C III stood to lose very little if anything, since it was thinly capitalized, and its promissory note

[17](...continued)
encouraged by business or regulatory realities. Here, we find the opposite. The substance and form of the transaction between Holdings and B&C III make clear that the parties were not dealing with each other at arm's length, and the transaction was very much a "familial one".

**[\*41]** to Holdings for the purchase of the property was not secured by collateral or by personal guaranties by B&C III's members.

Like the parties' agreements concerning the insurance of the property, the parties' agreements concerning property taxes further detract from the Cuthbertsons' position. Contrary to the provisions in the LPA and the EGC lease,[18] Holdings evidently retained the "obligation to pay taxes" for years after 2009, since Holdings, rather than B&C III or EGC, was in fact the party that paid them.

For the most part, B&C III did not acquire the benefits and burdens of owning the golf course, so Holdings did not actually sell the property to B&C III. Holdings is therefore not entitled to claim any loss on the sale of the property.

### 3. "Economic reality"

Focusing on the substance of the Cuthbertsons' dealings with their daughter and son-in-law's entity, rather than the form the Cuthbertsons nominally followed, we find almost no evidence that a true sale occurred between Holdings and B&C III. This would be true even without the heightened scrutiny we apply to intrafamily transactions, and it is especially true in light of that standard.

---

[18]EGC's lease had no explicit provision about taxes but did require EGC to transfer into its name "all other costs and expenses of every kind whatsoever".

**[\*42]** Generally, taxpayers are free to arrange their affairs to minimize their tax liabilities, and a taxpayer does not have even a patriotic duty to increase his or her own tax liability. Helvering v. Gregory, 69 F.2d 809, 810 (2d Cir. 1934), aff'd, 293 U.S. 465, 469 (1935). On the other hand, "[w]hile it is true that a taxpayer can structure a transaction to minimize tax liability under the Internal Revenue Code, that transaction must nevertheless have economic substance in order to be 'the thing which the statute intended.'" Kirchman v. Commissioner, 862 F.2d 1486, 1491 (11th Cir. 1989) (quoting Gregory v. Helvering, 293 U.S. at 469), aff'g Glass v. Commissioner, 87 T.C. 1087 (1986). Holdings' purported sale of the Edgewater golf course land to B&C III was not a legitimate arm's-length transaction that they simply arranged in a tax-favorable manner. Rather, "it is patent that there was nothing of substance to be realized by [the taxpayers] * * * from this transaction beyond a tax deduction." Knetsch v. United States, 364 U.S. 361, 366 (1960).

The caselaw of the Fourth Circuit, in which an appeal would lie in this case, applies a test to which it refers as "a two-pronged 'economic reality' test", which looks to two factors: (1) the intent of the parties, and (2) the economic substance of the transaction." United States v. Bergbauer, 602 F.3d 569, 577-578 (4th Cir. 2010) (quoting Gen. Ins. Agency, Inc. v. Commissioner, 401 F.2d 324, 330

**[\*43]** (4th Cir. 1968), aff'g T.C. Memo. 1967-143).  Both determinations "are

questions of fact, with the taxpayer bearing the burden of proof."  Id. at 578.

### a.      The intent of the parties

In examining the parties' intent, the Court of Appeals in Bergbauer first

examined the plain language of the transaction documents before turning to

extrinsic evidence, and we will do the same.  The distinctive terms of the LPA lead

us to conclude that it is not the instrument that it purports to be--an arm's-length

contract for deed.  Contracts for deed are often used in certain circumstances:

> If an institutional loan is not available or is insufficient to permit the
> purchaser to complete the transaction, the seller is sometimes willing
> to finance a portion of the purchase price on the property.  This
> financing arrangement may take the form of a purchase money
> mortgage.  Alternatively, the seller may prefer a long-term installment
> purchase contract, often called a "contract for deed" or a uniform real
> estate contract.  \* \* \*  [Emphasis added.]

14 Powell on Real Property, sec. 81.01[3][e] (M. Wolf ed. 2019).  But in this case

the purported "contract for deed" financed not a portion but all of the purchase

price and provided not for installments but for a balloon payment after five years.

A contract for deed (also referred to as an "installment land contract") operates

similarly to a traditional mortgage (i.e., giving the lender an interest in the

property and requiring payment before the buyer has an unencumbered interest)

but is sometimes used for higher-risk borrowers, see 15 Powell on Real Property,

[*44] supra, sec. 84D.01[2], in which case we would expect to see terms less favorable for the borrower than a traditional mortgage. That is, for an arm's-length contract for deed, we would expect to see a higher interest rate (rather than the 6.0% rate stated in the LPA or the 5.0% rate (inexplicably 1% lower) in the corresponding promissory note), or increased required amounts of collateral (rather than the unsecured arrangement in the LPA), or personal guaranties (also lacking in the LPA). This is the scenario about which Mr. Hinson, the Cuthbertsons' real estate attorney, testified--that contracts for deed are used for seller-financing when buyers are unable to obtain third-party-lender financing. The biggest difference between an installment land contract and a mortgage financed real estate transaction is that normally under an installment land contract, "the vendor retains legal title to the property until all of the purchase price has been paid". Id. sec. 84D.01[1]. That feature is present in the LPA, but the other features typical in contracts for deeds are lacking from the LPA between Holdings and B&C III.

We find instead that the attributes of the LPA that are different from those in normal contracts for deed reveal the parties' intent. The transaction as they carried it out got the golf course property nominally "off the books" of Mr. Cuthbertson's entities, as his lenders required, but left the ostensible purchaser

[*45] with no obligation to make any payment, and left Mr. Cuthbertson free to exploit the golf course's value for his residential developments. From the eight corners of the LPA and the promissory note executed by B&C III, and even from Mr. Cuthbertson's own testimony, the parties' intent is clear: Get the golf course nominally "off the books" to satisfy the lenders. Therefore, Mr. Cuthbertson and his family members undertook the transactions necessary to get it off the books, without causing any of them to incur any additional liabilities.

With respect to the Cuthbertsons' intent, the record contains no evidence of serious negotiations. Rather, Holdings sought no collateral, no credit report, no tax returns, no demonstrated liquidity, and no personal liability from the property's "purchaser", and they charged no premium over the appraised value to compensate them for the high-risk manner of financing of the purchase or the time value of money. These remarkable terms make the parties' intent clear: Mr. Cuthbertson never really intended to impose actual obligations or consequences upon Ben and Crystal's entity, B&C III, if it defaulted on the LPA. In reality, all of the parties intended to leave their situations unchanged.

b.     The requirement of economic substance

The economic substance of this transaction also undermines the Cuthbertsons' claimed tax treatment of the transaction as a sale of the golf course

[*46] by Holdings to B&C III. There was no substance; the "sale" from Holdings to B&C III altered nothing.

As is discussed above, a contract for deed is similar to a mortgage, but when instead a buyer enters into a contract for deed (such as the LPA at issue here),[19] the seller retains title; and, except where State law requires that the property be sold in a foreclosure sale, upon default that title-holding seller can simply seize the property without foreclosure under the contract's forfeiture clause. See 15 Powell on Real Property, supra, sec. 84D.03[1]. "Under state recording acts, an installment purchaser is unprotected against a subsequent taker of the property who acquires an interest without notice of the installment land contract." Id. sec. 84D.02[1]. Thus, the "purchaser [using a contract for deed] is well advised to record either the contract or some summary or other evidence of the contract that is sufficient to provide notice to third parties." Id. We do not say that a contract for deed can never have economic substance; but in the context of the transactions at issue here, the contract for deed--the atypical terms of which we discussed

---

[19]The LPA references a supposed "mortgage" that was executed on the same date; but if the parties to the LPA prepared and executed such an instrument, then the Cuthbertsons failed to enter it into the record. If, as seems more likely, the LPA's reference to the mortgage is in fact an inaccurate reference to the unsecured promissory note, which lacks the fundamental characteristic of a mortgage, then this careless reference in the LPA (or the parties' failure to carry through by executing a mortgage) further underscores the unseriousness of the transaction.

[*47] above in part III.A.3.a--is truly insubstantial. The month before the end of the 2009 tax year, Mr. Cuthbertson paid an appraiser to value the Edgewater golf course. That same month, the Cuthbertsons' daughter and son-in-law organized-- and did not capitalize--an LLC; and in the final days of that year, their LLC "bought" the land underlying the Edgewater golf course with an unsecured, low- interest, nonrecourse promissory note promising a balloon payment five years later in the exact amount of the appraiser's valuation. There is no evidence that the LLC recorded the LPA in the county land records. Five years later, the Cuthbertson's entity (Holdings) no longer held the note, and no payments of any kind had been made under it. (Rather, not quite a year after the note had been executed, it was sold for 15% of its face value (i.e., for $95,700 rather than $660,000).)

In the meantime, EGC (another entity owned by the Cuthbertsons) continued to operate the Edgewater golf course as it always had. EGC had the option to extend its existing lease with Development in six-month increments for no additional consideration, and there is no evidence that it ever terminated that lease. But on January 1, 2010 (a date on which its old lease would not have expired, if EGC had been exercising its option), EGC entered into the new lease with B&C III, giving to EGC the right to possess property that it already

[*48] possessed.  EGC's new terms with B&C III were less favorable, as EGC would now purportedly owe to its new landlord, in addition to its $1 rent (in perpetuity), additional rent consisting of a percentage of its net profits; and EGC would continue to hold virtually every benefit and burden of the Edgewater golf course property.  So unserious was the December 2009 transaction that, in the LPA, Holdings purported to sell improvements that the Cuthbertsons contend (and we assume) Holdings did not own; and the parties behaved--without any warrant in the documents--as if the clubhouse went along with the deal as well.

The minimal amount of actual consideration paid at the time the LPA was executed and the deferred future transfer of title are characteristics more aptly associated with an "option to purchase", which "unilaterally binds the seller to keep an offer of sale open at a specified price and on designated terms for a specified period of time."  14 Powell on Real Property, supra, sec. 81.01[2][b].  An option to purchase, which does not transfer ownership of the property, is a characterization that the Cuthbertsons resist, since they argue that B&C III was "obligated * * * to pay the purchase price of $660,000 on or before December 31, 2014"--but this "obligat[ion]" was an unsecured note to an entity owned by the father of B&C III's principals; the note was promptly sold at a steep discount to a

[*49] friendly party; and the note was essentially ignored by the parties until the IRS took an interest in the situation.

Admittedly, the transaction between Holdings and B&C III lacked some characteristics of an option. In consideration for executing an actual option, a "seller also generally receives a non-refundable payment from the purchaser as consideration for the option"; that is, "[t]o be bound by an option, the seller must receive valuable consideration." Id. (emphasis added). That feature was lacking in this case.

Consequently, the instrument and the underlying promissory note at issue here lack some of the characteristics of either a "contract for deed" or of an "option". It was instead a unique hybrid transaction, conceived by Mr. Cuthbertson, the critical feature of which was that it allowed him to present the financial records of Holdings to his lenders without inclusion of the golf course. Additionally, as we observed in the discussion of the benefits and burdens, in part III.A.2, the payments by Holdings of the insurance and taxes on the property illustrate the true economic substance of the transaction.

The Court of Appeals in Bergbauer found that the "economic reality test was met because the terms of the transaction were grounded in 'business reality such that reasonable men, genuinely concerned with their economic future, might

[*50] bargain for such an agreement.'" Bergbauer, 602 F.3d at 580 (quoting Gen. Ins. Agency, Inc. v. Commissioner, 401 F.2d at 330). However, in this case, we find the opposite. No person "genuinely concerned with their economic future" would bargain for an agreement like the one entered into by Holdings. We hold that the purported sale of the golf course by Holdings to B&C III lacked economic reality.

B. Development's claimed loss on the 2009 sale or abandonment of the Edgewater golf course improvements

As we explained above in part III.A.1, we assume, consistent with the Cuthbertsons' contention, that Development owned the golf course improvements in 2009. Although the Cuthbertsons initially reported on their tax return that Development sold the improvements to the Edgewater golf course at a $5.3 million loss,[20] consistent with Development's records,[21] there is no evidence of any such sale; and the Cuthbertsons now argue instead that Development abandoned the improvements in the final days of 2009, at the same time that Holdings

---

[20]This loss flows through from Development's Form 1065, reflected on the Form 4797, reporting the transaction under Part II, "Ordinary Gains and Losses".

[21]Mr. Moyer, petitioner's accountant, testified that the abandonment of the improvements was characterized on the accounting records as a "mass sale". We did not find credible his testimony that this was simply the result of his computer's accounting software not having "abandonment" as an option.

[*51] purportedly sold the underlying land. We now address that claimed abandonment loss.

The Court of Appeals for the Fourth Circuit (to which an appeal of this case would lie) has noted "the general rule that a taxpayer cannot recharacterize a transaction to avoid the tax consequences of the form of the transaction actually chosen," Snowa v. Commissioner, 123 F.3d 190, 198 n.11 (4th Cir. 1997), rev'g on other grounds T.C. Memo. 1995-336, and has held that, "[g]enerally, taxpayers are liable for the tax consequences of the transaction they actually execute and may not reap the benefit of recasting the transaction into another one substantially different in economic effect that they might have made", Estate of Leavitt v. Commissioner, 875 F.2d 420, 423 (4th Cir. 1989), aff'g 90 T.C. 206 (1988). Here again, we follow the economic reality test recently re-affirmed by the Court of Appeals in Bergbauer, 602 F.3d at 580, and the burden of proof remains with the Cuthbertsons.

On brief the Cuthbertsons assert that two actions demonstrate the abandonment of the Edgewater golf course improvements: (1) that Development sold the golf course maintenance equipment to EGC and (2) that Development wrote off, in its accounting and financial statements, its costs of the improvements.

[*52] The Cuthbertsons argue in support of abandonment treatment that the sale of equipment used at an immovable facility has, in at least one other case, been found sufficient to prove abandonment of intangible improvement costs.  See A.J. Indus., Inc. v. United States, 503 F.2d 660, 663-664 (9th Cir. 1974).  That statement is true, but the Cuthbertsons ignore several critical differences that distinguish that case from their own supposed "abandonment"--namely, that in A.J. Indus., Inc. there was no question of ownership of legal title to the land involved, that the taxpayer's sale of equipment used at a mining facility was to an unrelated third party, and that the mining facility ceased all operations after the sale of the equipment (and it had periodically ceased operations, before the sale). Id.  The Court of Appeals explained that the asset for which the loss was claimed "is not the mine or the real estate, and no question of legal title to the land is involved. It is an amount separable and identifiable from the land itself."  Id. at 663 (emphasis added).  The Cuthbertsons' equipment sale, by contrast, was from one entity whose equity was owned 99% and 1% by Mr. and Mrs. Cuthbertson to another entity identical in ownership.  Finally, the Edgewater golf course continued its operations, completely unaffected by this "abandonment", using the improvements that had been "abandoned".  The act of abandonment must constitute "some step that irrevocably cuts ties to the asset" and must be

[*53] "visible to outside observers". Corra Res., Ltd. v. Commissioner, 945 F.2d 224, 226 (7th Cir. 1991), aff'g T.C. Memo. 1990-133. The "owner" of the lawnmowers and equipment (formerly Development) had changed (now EGC); but before and after, it was EGC that kept cutting the grass, and thus the abandonment of the golf course improvements was not perceptible to anyone. (These facts also distinguish this case from A.J. Indus., Inc.)

We are unpersuaded that Development abandoned the Edgewater golf course improvements. The evidence that Development wrote off the improvements on its internal records could just as well be invoked to try to prove that the Cuthbertsons thought they had sold the improvements--and such a conclusion would be more consistent with the manner in which the Cuthbertsons reported the "loss" by Development (i.e., as a loss from the sale of business property). And the fact that the Cuthbertsons sold a relatively small amount of maintenance equipment to another of their own identically held entities, which continued to operate and maintain the golf course, hardly indicates that they had a real desire to abandon anything.

An asset is abandoned when it "is permanently retired from use in the trade or business". See 26 C.F.R. sec. 1.167(a)-8(a)(3), Income Tax Regs. One does not abandon an asset when he makes it available to his own entity for continued

[*54] use in the business for which it was created. It is quite clear that Mr. Cuthbertson was not indifferent to the fate of the golf course property, in which Development had invested millions of dollars. He did not leave it to go to seed. On the contrary, his entities picked it right up and continued to maintain and operate it for the benefit of enhancing the sale value of residential lots in the Edgewater development.

The 2014 "addendum" to the LPA by B&C III and Development further demonstrates that the golf course improvements were not abandoned. When those three entities purported to agree in that addendum that Development would take $100 to "abandon" the golf course improvements, they made it crystal clear that all the parties had understood and intended that the golf course improvements would be a part of the ongoing Edgewater development.

The Cuthbertsons' claim of an abandonment loss also fails to meet the economic reality test applied by the Court of Appeals for the Fourth Circuit. The evidence shows that the Cuthbertsons and their entities did not intend to abandon the Edgewater golf course improvements, and the economic substance of the transaction is that the same entity (the Cuthbertsons' EGC) was operating the golf course before and after the supposed "abandonment".

**[*55]** C.     Bulk notes sale

Our analysis of the bulk notes sale to Mr. Tucker in 2010 is governed by the same authority as our analysis of Holdings' "sale" of the Edgewater golf course land. Section 165 provides for the deductibility of losses from the sale of property. Under 26 C.F.R. section 1.165-1(b), Income Tax Regs., again, "a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and * * * actually sustained during the taxable year. Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss." (Emphasis added.) See also Du Pont v. Commissioner, 118 F.2d 544, 545 (3d Cir. 1941) (noting that a "controlled or sympathetic vendee" can "divest a sale of its fundamental incident of finality"), aff'g 37 B.T.A. 1198 (1938), and aff'g Raskob v. Commissioner, 37 B.T.A. 1283 (1938). Like the taxpayer in Du Pont, the Cuthbertsons "attempt to give verisimilitude to their transactions by reliance upon their own protestations and upon their construction of * * * [these] circumstances, all of which may be said to be open to two interpretations, one favorable and the other dubious." Id. at 547.

Even if Mr. Tucker was an unrelated party, the structure and treatment of the transaction would also preclude the Cuthbertsons' deduction of the losses arising from it. As with the sale of the Edgewater golf course land, the unserious

[*56] manner of the parties' dealings makes it unclear which precise transaction could or should be examined. If one views the December 2010 transfer of notes from Mr. Cuthbertson to Mr. Tucker in exchange for Mr. Tucker's March 2011 transfer of $406,000 to Mr. Cuthbertson, standing alone, then it is difficult to respect that transaction, which neither Mr. Cuthbertson nor Mr. Tucker respected. First we examine what was sold: the 14 notes. Both men testified that they never made any collection efforts under the 14 notes, even as the notes matured and their makers made no payments toward the balance; and both men reduced the initial interest rates of various notes to three-quarters of a percent. Serious lenders would generally seek more security than the borrowers' fear of reputational damage in the event of default. Mr. Tucker admitted he would never have sued to enforce the notes, and Mr. Cuthbertson retained an option to buy the notes back (by which he could have protected his family and its entities if Mr. Tucker had become active in collection). Additionally, Mr. Tucker responded to defaults on the notes by extending the maturity dates and lowering the interest rates on the loans so that they were still outstanding years later--the opposite actions that one might expect from a party lending at arm's length. Consequently, if we view the note sale in isolation, the evidence shows that it was not bona fide.

**[*57]** The better approach--more consistent with the evidence, the structure of the transaction, and the economic reality surrounding it--is to view the note sale and the Lot Purchase Agreement together as a notes-for-land exchange. This conclusion is supported by Mr. Cuthbertson's testimony that his purchase of the land was intended to incentivize Mr. Tucker to buy the notes from him and by the fact that the cash consideration nominally changing hands was $406,000 for the notes and $412,000 under the Lot Purchase Agreement. Meanwhile, Mr. Cuthbertson and Mr. Tucker agreed to allow Mr. Tucker to swap a different piece of real estate well after the close of the 2010 tax year without adjusting the cash consideration. The Cuthbertsons, who bear the burden of proof, failed to offer any evidence as to the timing of the transaction and the value of this substituted property. Accordingly, even assuming arguendo that the notes were bona fide and that Mr. Tucker intended to enforce them, the evidence of the offsetting notes-for-land arrangement and the failure to convey the property that had been "bargained" for under the Lot Purchase Agreement make it clear that the bulk notes sale was not a "closed and completed transaction".

The Cuthbertsons thus failed to prove that the transaction between Mr. Cuthbertson and Mr. Tucker at the end of 2010 was closed and completed.

[*58] The Cuthbertsons are therefore entitled to no deduction under section 165 for that transaction for 2010.

IV.    Lot transfers

Development used the installment method to account for income it realized on the sales to True Homes during the 2008 and 2009 tax years. However, Development is a dealer selling real property in the ordinary course of its trade or business; accordingly, such installment sale treatment would, as the Cuthbertsons now admit, be inappropriate because the installment method of accounting is not available for "dealer disposition[s]", sec. 453(b)(2)(A), which are defined to include "[a]ny disposition of real property which is held by the taxpayer for sale to customers in the ordinary course of the taxpayer's trade or business", sec. 453(l)(1)(B). The SNOD holds Development to the "sale" characterization of these transfers but corrects for the improper accounting method by recognizing all of the income in the year of the transaction rather than deferring a portion of it. The Cuthbertsons resist the IRS's adjustments for two reasons: (1) that the adjustments have no basis in law and (2) that the property transfers were simply transfers of equity (i.e., they ask us to apply the substance-over-form doctrine, and in effect to recast the property transfers as a different type of transaction).

**[\*59]** A.    Development's contemporaneous characterization of the sales

Development reported these transactions as "sales" in its audited financial statements for 2009 and 2010 and on its tax returns for 2008 (we infer) and for 2009 (in evidence); but on those tax returns it reported only a portion of the proceeds as income (i.e., as "sales" and <u>not</u>, the 2009 return shows, as distributions); and it failed to file with those tax returns a Form 6252, which would have reported the installment sale treatment.

Development, True Homes, and their principals and employees had the opportunity and responsibility to characterize these transactions in the manner that they thought most accurate--and at the first branch in their decision tree, before selecting an accounting method, they chose to characterize the transfer of these properties as "sales".  There is no evidence that they contemporaneously characterized them as distributions to the Cuthbertsons followed by contributions to True Homes.

B.    Changes in accounting methods

Section 446(a) requires a taxpayer to compute taxable income under the method of accounting it regularly uses in keeping its books.  Once the Commissioner determines that a taxpayer's method of accounting does not clearly reflect income, he has broad discretion to select a method of

[*60] accounting that, in his opinion, does clearly reflect the income of the taxpayer.[22] Sec. 446(b). The Commissioner's determination may be challenged only upon a showing of abuse of discretion. RACMP Enters. v. Commissioner, 114 T.C. 211, 218-219 (2000). Whether an abuse of discretion occurred depends upon whether the Commissioner's determination is without sound basis in fact or law. Id.; see also Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532 (1979).

The Cuthbertsons concede that their choice of bookkeeping labels was poor, but they argue that "the entities intended for the transfers to be equity contributions by Mr. Cuthbertson to True Homes". That is to say, rather than attempting to overcome the heavier-than-normal burden of showing that the Commissioner abused his discretion in changing the method for reporting sales, the Cuthbertsons now argue substance over form, attempting to recast the

---

[22]The Commissioner proposes for 2009 adjustments to the Cuthbertsons income based on changes in the accounting method for transactions that occurred in 2008, an apparently closed year for which year there are no adjustments proposed. The Cuthbertsons dispute this 2009 adjustment, but they do not dispute that, if an adjustment is called for, it may be made for 2009. Following a change of accounting method, the Commissioner may make any necessary adjustments to prevent taxable income from being duplicated or omitted as a result of the change under section 481(a). For purposes of section 481(a) adjustments, once there has been a change in the method of accounting, no statute of limitations applies to the Commissioner's authority to correct errors on old tax returns. See Mingo v. Commissioner, 773 F.3d 629, 636 (5th Cir. 2014), aff'g T.C. Memo. 2013-149.

[*61] transactions as not sales at all but rather a form different from what they originally reported as deferred income in Development's 2009 and 2010 Audited Financial Statements and on its 2008 and 2009 tax returns, i.e., recasting the transactions as changes in equity, rather than as sales.

C. Substance over form

Courts have established strict standards for a taxpayer who elects "a specific course of action and then when finding himself in an adverse situation [seeks to] extricate himself by applying the age-old theory of substance over form." Bergbauer, 602 F.3d at 576 (quoting Cornelius v. Commissioner, 494 F.2d 465, 471 (5th Cir. 1974), aff'g 58 T.C. 417 (1972)). "We have recognized that '[g]enerally, taxpayers are liable for the tax consequences of the transaction they actually execute and may not reap the benefit of recasting the transaction into another one substantially different in economic effect that they might have made.'" Id. (quoting Estate of Leavitt v. Commissioner, 875 F.2d at 423). The Cuthbertsons resist this application of Bergbauer, and instead argue that they should be excused from their initial characterization because they ask for only a change in bookkeeping labels.

**[*62]**        1.        Changing labels vs. recasting a transaction

In support of this argument they cite Sitterding v. Commissioner, 80 F.2d

939, 941 (4th Cir. 1936), rev'g 32 B.T.A. 506 (1935), for the proposition that

"[w]here there is no question of bad faith with regard to the bookkeeping entries,

the rights of the parties can neither be established nor impaired by the

bookkeeping methods employed."  However, in determining in Sitterding that the

distribution was in fact a distribution of corpus, the Court of Appeals observed

that the IRS's adjustment at issue was "based largely upon the fact that the

distribution made to the taxpayer was from an income account kept by the

executors" (i.e., they were paid from the wrong account).  Id. at 940-941.

The issue presented by the Cuthbertsons' argument is not from which bank

account Development paid Mr. Cuthbertson or True Homes; rather, the issue is

whether the Cuthbertsons can use the substance-over-form doctrine to recast the

transaction in a manner quite different from what they had previously described

and reported--which, we observe, is not the same thing as a "mere bookkeeping

entry".  This proposed recasting is undercut by two facts about Development's

financial reporting:  First, Development recorded its equivalent transactions with

Mr. Russell and Ms. Kiker--plainly not equity contributions--as sales, using the

same impermissible accounting method.  (The Cuthbertsons no longer dispute the

[*63] adjustments as to those sales.)  Second, when Development did engage in equity distributions, it knew how to report them.  Development did in fact record accounting entries for distributions of equity in the "Statement of Cash Flows" in its 2009 financial statement.  The transactions involving these parcels were not among those recorded distributions.

### 2.    Comparison to contemporaneous sale transactions

The Cuthbertsons attempt to bolster their substance-over-form argument by contrasting Development's property transfers to True Homes with Development's sale of property to Mr. Russell and Ms. Kiker.  In comparing the transfers to True Homes with those to Mr. Russell and Ms. Kiker (which the Cuthbertsons evidently concede are sales), the Cuthbertsons allege that "Development did not execute any sale documents for the transfers to True Homes"; but they allege that in the other transactions "Development required the purchasers to execute standard sale documents, including purchase agreements and promissory notes."[23]  This attempt to factually distinguish the transfers from Development to True Homes fails for several reasons.  First and foremost, the Cuthbertsons failed to offer any

---

[23]Mr. Moyer, the accountant, testified that the only evidence of which he was aware for the transfer of the three properties to True Homes was the respective deeds, which he contrasted to the sales to Mr. Russell and Mrs. Kiker, for which he said he recalled receiving other "sales documents".  In the absence of corroborating documentation, his testimony was not convincing.

[*64] documentary evidence that would support their claims. Rather, they cite only the testimony of Mr. Cuthbertson and his accountant Mr. Moyer, who both testified that the transactions were documented in different manners. On the issue of the contract for deed for the golf course (discussed above), the Cuthbertsons' real estate attorney, Mr. Hinson, testified that "a standard transaction would be a deed filed that would convey clear and fee simple, absolute title." Evidently, that is, a deed would suffice. Mr. Cuthbertson's and Mr. Moyer's testimony (that the transfers from Development to True Homes were substantiated by a deed) and Mr. Hinson's testimony (that a deed is sufficient) undercut the Cuthbertsons' argument that the lack of other "sales" documents besides the deed is an indicium of a transfer of equity rather than a sale. And, finally, in light of the anomalies discussed above in connection with the Cuthbertsons' other transactions, we have serious doubts about how "standard" the other sales documents are.

### 3.    Contrasting the 2009 and 2010 financial statements

The Cuthbertsons attempt to bolster their substance-over-form argument by pointing out supposed differences between Development's 2009 and 2010 financial statements. They point to the disclosure of "Related party transactions" in Development's 2010 financial statement, and they argue that the lack of any

[*65] such disclosures in the 2009[24] financial statement shows that they intended to treat the 2009 transfer from Development to True Homes, as distributions and contributions. That is, the Cuthbertsons ask us to take the silence about "Related party transactions" in the 2009 financial statements as evidence that no such transactions took place--in particular, that no sale transaction between Development and True Homes took place--in 2009, since (they say) they did report such transactions when they did take place, e.g., in 2010.

In our view, this does not establish a factual basis for the Cuthbertsons' argument; rather, it seems just as likely to be simply another example of the recurring inconsistencies in the documentation of their transactions and of their nonobservance of the formalities required by their transactions. If the Cuthbertsons had kept their records in good order other than in this one instance, then perhaps we would find this argument plausible; but in light of the other abnormalities we have noted herein, the fact that there is in one year a reporting of

---

[24]Two of the three sales at issue were in 2008; but because the Cuthbertsons did not offer 2008 financial statements into evidence, we do not know how Development's 2010 financial statements compare to its 2008 financial statements.

[*66] "Related party transactions" and no reporting of the same transactions in the prior year proves little about the nature of the transfers at issue here.[25]

Moreover, this argument is contradicted in the instance of Development's 2009 sale of the golf course maintenance equipment to EGC--apparently a "Related party transaction[]" that took place in 2009. The bill of sale, which purports to transfer title to the golf course maintenance equipment listed thereon, states: "This Bill of Sale shall be effective as to the transfer of all property listed in it as of December 31, 2009." Development's 2009 "Audited Financial Statements For Year Ending December 31, 2009" lists EGC as a related party. Mr. Moyer testified:

---

[25]Questions about the accuracy of Development's 2009 audited financial statement also arise when we compare representations made therein to the parties' stipulations in this case. The Cuthbertsons here stipulated that Development transferred the 1,032 acres of Edgewater Phase 2 and the 561 acres of Edgewater Phase 3 to Holdings by the end of 2007. However, in Development's "Notes to Financial Statements" for the year ending December 31, 2009, the last note states: "The Edgewater Project--Phases I & II * * * [are] a portion of the larger overall Edgewater project which totals approximately 1,900 acres. * * * At December 31, 2009, Craft Development, LLC is the primary property owner." (Emphasis added.) The disclosure goes on to explain: "Property taxes and assessments due January 15, 2010 total approximately $2,600,000", and "[s]ubsequent to December 31, 2009, * * * [Development] had paid approximately $364,000 of the $2,600,000 due." This is to say that in their own audited financial reports, prepared on March 19, 2010, for the year ending December 31, 2009, the Cuthbertsons represented to their investors and lenders that Development, rather than Holdings, was the "primary property owner"--thus incorrectly representing the ownership of the property.

**[*67]** Under accounting standards, auditing standards, if you have actual sales between related entities, <u>you have to disclose those sales</u>. Obviously you could be misreporting total consolidated sales by showing sales between entities like this. So this is just simply stating those sales between the companies.

But Development's 2009 financial statement is no more silent about Development's lot sale to True Homes than it is about Development's equipment sale to EGC--which we know <u>did</u> take place. Silence about a related-party sale in Development's financial statements is not reliable evidence that no related party sale occurred.

### D. The basis for the IRS's adjustments

Finally, circling back to the Cuthbertsons' first argument (i.e., that "the Commissioner's determination is arbitrary and has no basis in law"), the Commissioner's adjustment to the Cuthbertsons' income is clearly supported by statute and precedent on this topic. Even if the Cuthbertsons had produced documents that reliably showed substantial differences in the manner in which Development documented its transactions with True Homes, the record lacks any evidence that the Cuthbertsons actually intended to treat Development's transfers to True Homes as capital distributions to the Cuthbertsons followed by capital contributions by the Cuthbertsons to True Homes, rather than intending to treat them as sales. "To put it plainly, we have bound taxpayers to 'the "form" of their

[*68] transaction' when they attempt to recharacterize an otherwise valid agreement bargained for in good faith. We have also refused to entertain arguments 'that the "substance" of their transaction triggers different tax consequences.'" Bergbauer, 602 F.3d at 576 (quoting Estate of Leavitt v. Commissioner, 875 F.2d at 423). The Cuthbertsons and their company must treat these transactions as they themselves characterized them (i.e., as "sales") and must use a proper method of accounting to do so (i.e., not by the installment method inappropriate for "dealer disposition[s]", sec. 453(b)(2)(A), (l)(1)(B)).

## V. Accuracy-related penalties

### A. Substantial understatement

Section 6662(a) and (b)(2) imposes a 20% accuracy-related penalty on an underpayment of tax attributable to a substantial understatement of income tax. An understatement is "substantial" if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A). By this measure, the Cuthbertsons' understatements of income tax for 2009 and 2010 were substantial.

### B. Supervisory approval

Under section 7491(c) the Commissioner has the burden of production as to liability for penalties; and after the trial of this case, this Court issued its opinion

**[\*69]** in <u>Graev v. Commissioner</u> ("<u>Graev III</u>"), 149 T.C. 485 (2017),

<u>supplementing and overruling in part</u> 147 T.C. 460 (2016), holding that the burden

of production includes showing that the immediate supervisor of the individual

IRS employee who made the "initial determination" of the penalty approved that

penalty in compliance with section 6751(b)(1). We therefore ordered the parties

in this case to address the issue of compliance with section 6751(b)(1) and to file

"any motions they deem appropriate in light of" <u>Graev III</u>. The Commissioner

asserted that he had fulfilled that burden by offering into evidence at trial the civil

penalty approval form that had been signed by the immediate supervisor in

August 2013, 21 months before the SNOD was issued.

The only dispute about supervisory approval that the Cuthbertsons then

raised was the contention[26] that on July 11, 2013--<u>before</u> the penalty approval

form was signed--the IRS issued to the Cuthbertsons a "30-day letter" to which

was attached a Form 5701 that included accuracy-related penalties asserted against

the Cuthbertsons. A 30-day letter may indeed constitute an "initial determination"

---

[26]The Cuthbertsons did not offer into evidence the 30-day letter that they describe in their brief. Even after we solicited "any motions they [the parties] deem appropriate", the Cuthbertsons did not move for leave to reopen or supplement the trial record. Consequently, the evidence in this case consists only of a penalty approval form--authenticated by the parties' stipulation--that was duly signed by the immediate supervisor 21 months before the SNOD was issued.

[*70] that fails to comply with section 6751(b)(1) if it lacks supervisory approval. See Clay v. Commissioner, 152 T.C. 223 (2019). However, the Cuthbertsons are unable to make that case because they acknowledge that their 30-day letter was signed by the immediate supervisor. Consequently, to the extent the 30-day letter included a penalty determination, that determination was approved--by the signing of the 30-day letter--before the letter was issued to them. The approval is not rendered invalid because it was not given on a specific form. Rather, "the IRS's use of a form other than the one prescribed by internal administrative regulations does not preclude a finding that the supervisory approval requirement has been satisfied." Palmolive Bldg. Inv'rs, LLC v. Commissioner, 152 T.C. 75, 85 (2019) (citing PBBM-Rose Hill, Ltd. v. Commissioner, 900 F.3d 193, 213 (5th Cir. 2018) ("The plain language of § 6751(b) mandates only that the approval of the penalty assessment be 'in writing' and by a manager")). As in Frost v. Commissioner, 154 T.C. ___, ___ (slip op. at 23) (Jan. 7, 2020), "petitioner has not claimed * * * that respondent formally communicated his initial penalty determination to petitioner before the date that the examining agent's manager" approved the penalty--approved in this case (the Cuthbertsons effectively admit) by signing the 30-day letter itself.

**[\*71]** C.     <u>Reasonable cause</u>

Under section 6664(c)(1), the underpayment penalty does not apply to any portion of an underpayment if a taxpayer had reasonable cause and acted in good faith with respect to that portion; this reasonableness analysis takes into account the taxpayer's experience, knowledge, and education.  26 C.F.R. sec. 1.6664-4(b)(1), Income Tax Regs.  Reliance on the advice of a tax adviser may constitute reasonable cause and good faith if such reliance was itself reasonable and in good faith.  <u>Id.</u>  The Cuthbertsons allege that they relied on their accountant, Mr. Moyer.

To show reliance on an adviser, a taxpayer must prove that:  (1) the adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer gave the adviser the necessary and accurate information, and (3) the taxpayer actually relied in good faith on the adviser's judgment. <u>Neonatology Assocs. P.A. v. Commissioner</u>, 115 T.C. 43, 99 (2000), <u>aff'd</u>, 299 F.3d 221 (3d Cir. 2002).  While the Commissioner bears the initial burden of production to show a substantial understatement of income tax, sec. 7491(c), once that burden is satisfied, the taxpayer bears the burden of proving defenses to penalties, <u>Higbee v. Commissioner</u>, 116 T.C. 438, 446 (2001).

The Cuthbertsons failed to show reliance on an adviser, and their principal failing was that they did not show that they gave Mr. Moyer the necessary and

[*72] accurate information. We do not know (i.e., they did not prove) what they showed him. Mr. Moyer gave testimony about his supposed general practices but gave little declarative testimony about the Cuthbertsons. He testified that, generally, he reviews most items on his clients' tax returns, although subordinate employees prepare the details, and that, generally, if he could not determine how to deal with a financial or tax item, he would ask the client for further information. He testified that Mr. Cuthbertson has typically been forthcoming with information when Mr. Moyer has made requests of him.

However, much of Mr. Moyer's testimony was stated in the subjunctive-- i.e., when he was asked how he acted, or what he did in a certain situation, he answered what he "would have" done. For example, Mr. Moyer testified that he "would have" received various documents relating to the transaction between B&C III and Holdings, and Development's sale of golf course maintenance equipment to EGC.

As to the bulk notes sale, Mr. Moyer testified that in general he would have asked for and received whatever information was necessary to prepare a return for the Cuthbertsons and their entities, but also that he was not aware of the related Lot Purchase Agreement that, we found, was critically related to the notes sale.

[*73] Similarly, as to the issue of Development's use of the installment method of accounting to defer income on the transfer of property to True Homes, when asked whether he had "ask[ed] for any additional information or other documents that you did not receive with respect to these transfers", he testified: "I would have received everything that I would have asked for, yes." The Court finds Mr. Moyer's testimony--to the extent that it was subjunctive--unpersuasive at best, since it was not informative as to what actually happened, and evasive at worst. Mr. Moyer was not aware that the bulk notes sale by three of the Cuthbertsons' entities was only the first half of a notes-for-land exchange. Accordingly, the Cuthbertsons have failed to prove that they gave their adviser the necessary and accurate information.

Lastly, while we think it probable that the Cuthbertsons relied on Mr. Moyer's advice, they have not proved that such reliance was in good faith. As to the Edgewater golf course transfer to B&C III, the entire transaction seems to have lacked a good-faith business purpose. The Cuthbertsons knew that they did not abandon the golf course, that they entered into transactions that did not reflect arm's-length dealings or have arm's-length terms, that the transactions were funded by near-worthless (if not completely worthless) notes, and that they did not even respect the terms of their own non-arm's-length transactions.

[*74] Consequently, the Cuthbertsons are liable for the accuracy-related penalty under section 6662(a) and (b)(2) for the substantial understatement of income tax attributable to the loss deductions claimed in connection with the Edgewater golf course transaction with B&C III, the supposed abandonment of the golf course improvements, and the bulk notes sale to Mr. Tucker.

To reflect the foregoing,

An appropriate order will be issued, and decision will be entered under Rule 155.